UNITED BRAKE SYSTEMS, INC., dba )
MIDLAND GRAU HEAVY DUTY )
SERVICE CENTER, ECHLIN, INC., )
BRAKE SYSTEMS, INC. and FRICTION )
MATERIALS, INC., )
                                 )

       Plaintiffs/Appellees, )        Appeal No.
                                 )        01-A-01-9610-CH-00448
v. )

                                 )        Davidson Chancery
AMERICAN ENVIRONMENTAL )        No.     94-2864-III
PROTECTION, INC., )

       Defendant/Appellant, )

                                 )
and )

                                 )
LEE BARR, )

                                 )
       Defendant/Appellee. )

**FILED**

**April 23, 1997**

**Cecil W. Crowson**
**Appellate Court Clerk**

## COURT OF APPEALS OF TENNESSEE

## MIDDLE SECTION AT NASHVILLE

### APPEAL FROM THE CHANCERY COURT FOR DAVIDSON COUNTY

### AT NASHVILLE, TENNESSEE

### THE HONORABLE ROBERT S. BRANDT, CHANCELLOR

PHILIP M. KIRKPATRICK
JOHN E. ANDERSON
Stewart, Estes & Donnell
SunTrust Center
424 Church Street, 14th Floor
Nashville, Tennessee 37219-2392
       ATTORNEYS FOR PLAINTIFFS/APPELLEES

JOE F. GILLESPIE, JR.
6408-A Clarksville Highway
Joelton, Tennessee 37080
       ATTORNEY FOR DEFENDANT/APPELLEE
       LEE BARR

JOSEPH L. LACKEY, JR.
Lackey, Rodgers, Price & Snedeker
1230 First American Center
Nashville, Tennessee 37238-1230
       ATTORNEYS FOR DEFENDANT/APPELLANT
       AMERICAN ENVIRONMENTAL PROTECTION, INC.

### AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

SAMUEL L. LEWIS, JUDGE

# OPINION

This is an appeal by defendant/appellant, American Environmental Protection, Inc. ("AEP"), from a jury verdict rendered in the Davidson County Chancery Court. The jury determined AEP was liable to plaintiff/appellee, United Brake Systems, Inc. ("UBS")[1], for misrepresentation, conversion, and unfair competition. In addition, the court directed a verdict against AEP on UBS's breach of contract claim. The jury awarded UBS $130,892.00, court costs, attorney's fees, and $100,000.00 in punitive damages. The jury also determined AEP was liable to defendant/appellee, Lee Barr, for misrepresentation and awarded him $25,000.00 plus legal fees. The facts out of which this matter arose are as follows.

## I.      Facts and Procedural History

UBS maintained a facility in Nashville where it stocked brake linings, brake shoes with linings, and other brake hardware. The facility nearly burned down on 13 July 1994. There were 57,040 brake linings stored in the facility at the time of the fire. The inventory included Gray-rock and BT branded brake linings and 815 lined brake shoes all of which were ready to sell.[2] There was substantial damage to the building and the contents as a result of the fire and the firefighting efforts. The damage to the brake linings was so severe UBS's research and development staff determined the brake linings did not meet UBS's quality levels.[3]

Following the fire, UBS began obtaining bids for the demolition of the facility and the removal of debris. UBS contacted AEP about such a bid. Bill Halliburton of UBS spoke with Don Turner of AEP about a contract. Halliburton stated an essential requirement of the contract was that AEP take the brake linings to a landfill.

---

[1] There were three other plaintiffs in this case: Echlin, Inc., Friction Materials, Inc. and Brake Systems, Inc. Echlin, Inc. owns the other plaintiffs.

[2] UBS utilizes valuable trademarks. Those trademarks are "Gray-rock" and "BT." The registered owner of the BT trademark is Friction Materials, Inc., and the registered owner of Gray-rock is Brake Systems, Inc. The brand name of the lining is printed on the underside of the brake lining. UBS has expended substantial sums over the years to promote their trademark. No company other than UBS can utilize the Gray-rock and BT trademarks.

[3] Exposure to fire, water, and smoke diminishes the integrity and quality of the brake linings. Once the water soaks into the linings, they must be placed in an oven at 350 degrees Fahrenheit for twenty-four hours. The use of wet linings can result in "rust jacking." This occurs when moisture is transferred from the block to the metal and rust develops. A wet lining can come loose and result in brake failure.

He explained to Turner UBS did not want the damaged brake linings containing the Grey-rock and BT trademarks to get into the marketplace. Turner told Halliburton AEP would take the brake linings to an approved landfill. AEP and UBS entered into a contract on 21 July 1994. AEP prepared the contract which stated, in part, as follows: "All salvage rights to all items within the footprint of the demolished building are granted to [AEP] WITH THE EXCEPTION OF ANY AND ALL BRAKE LININGS WHICH SHALL BE PROPERLY DISPOSED OF AT AN APPROVED LANDFILL."

After entering into the contract, Halliburton met with Turner and Terry Reeves, also of AEP, at the UBS facility. Reeves asked about the importance of hauling the brake linings to an approved landfill. Once again, Halliburton explained UBS's concerns over products liability exposure and recognition of the registered trademarks. Reeves guaranteed Halliburton the linings would go to the landfill.

On Saturday morning, 23 July 1994, Halliburton and two other UBS employees removed 5,600 brake linings from the building. According to Halliburton and a comprehensive inventory control system, there were 57,040 brake linings in the building on the date of the fire. Thus, there were 51,440 linings inside the facility when Halliburton left on Saturday. When Halliburton went to the premises on Monday, 25 July 1994, it was evident that most of the contents of the facility had been removed.

On that same Saturday, Reeves contacted Lee Barr and presented him with a deal. Reeves told Barr he could have a forklift, parts, and a compressor in exchange for Barr's grade-all. Reeves also told Barr he could take the brake linings as long as he did not sell them in Nashville.

Thereafter, Barr's employees began hauling off materials including the brake linings. According to Barr's testimony, he hauled off 2,000 boxes of linings with approximately twenty-six linings in each box.[4] Barr testified Reeves and Bobby

---

[4] In his deposition, Barr testified there were twenty-six linings in each box. At trial, he claimed he had not stated there were twenty-six linings per box and that most of the boxes were small. When confronted with his deposition testimony, Barr claimed he did not know if the deposition statement was true or not but that some of the boxes were small.

Hargrove, an AEP employee, were present at the facility and saw Barr's employees loading the brake linings onto his truck. In addition, he stated Reeves allowed an AEP employee to help Barr load the brake linings. On Sunday, 24 July 1994, Hargrove left and told Barr to "lock the gate." When Barr had finished, he locked the gate and left. Barr later sold some of the brake linings in Indiana to Tim Gedeck, Mike Hannowsky, and Russell's Trailer Sales.

After AEP completed the cleanup, Scott Howell of Circle City Friction, a competitor of UBS contacted Halliburton. Howell informed Halliburton that a Tim Gedeck had approached Howell and offered to sell him what appeared to be UBS brake linings in burnt boxes. After his conversation with Howell, Halliburton was concerned the inferior, unapproved brake linings had gotten into the marketplace. Halliburton contacted Gedeck in Indianapolis. Gedeck advised Halliburton he had some UBS material which he intended to sell. Halliburton told him the linings were unapproved and were not to be sold. Gedeck advised Halliburton he was going to sell them anyway. Halliburton then contacted Reeves and informed him the brake linings from the UBS fire scene had appeared in the Indianapolis area and were being offered for sale. Reeves insisted Halliburton was mistaken because AEP had taken the brake linings to the landfill. Halliburton then contacted UBS's legal department who retained counsel in Indianapolis and in Nashville in order to recover the linings as quickly as possible.

UBS filed the instant suit on 21 September 1994. UBS alleged AEP was liable to UBS for misrepresentation, breach of contract, conversion, and violating the Lanham Act. UBS also alleged Barr was liable for violating the Lanham Act. AEP filed an answer, a cross-complaint, and a counter-complaint. AEP denied any wrongdoing and claimed it never authorized Barr to remove the brake linings from the facility. It alleged Barr was liable for breach of contract and for violating the Lanham Act. Finally, AEP alleged it performed all the terms of the contract between it and UBS and UBS breached the contract when it refused to pay AEP. Barr responded and claimed AEP had authorized him to take the linings. In addition, he alleged AEP was liable to him for fraud.

AEP and Barr moved for a directed verdict on UBS's Lanham Act claims at

the conclusion of UBS's proof and at the conclusion of all the proof. The chancellor denied the motions. At the close of all the proof, UBS moved for a directed verdict on its breach of contract claim. The court granted UBS's motion and also directed a verdict against AEP on its breach of contract claim against UBS. The remainder of the case went to the jury. The jury made the following findings: 1) UBS established by a preponderance of the evidence that AEP was liable for misrepresentation, conversion, and unfair competition; 2) UBS did not establish by a preponderance of the evidence that Barr was liable for conversion and unfair competition; 3) AEP did not establish by a preponderance of the evidence that Barr was liable for breach of contract; and 4) Barr established by a preponderance of the evidence that AEP was liable for misrepresentation. The jury then awarded UBS $130,892.00 damages which included attorney's fees, and court costs and awarded Barr $25,000.00 plus attorney fees. Finally, the jury determined AEP's actions entitled UBS to punitive damages. After a separate hearing, the jury awarded UBS $100,000.00 in punitive damages.

AEP moved to set aside the verdict and to grant AEP a new trial or a remittitur after the court entered its final judgment in accordance with the jury verdict. UBS filed a motion requesting discretionary costs and a motion to declare the case an exceptional case so the court could award it attorney's fees under the Lanham Act. Thereafter, the court awarded UBS $3,141.75 in discretionary costs, declared the case was exceptional under the Lanham Act, and denied AEP's motions for a new trial. AEP filed a notice of appeal on 24 May 1996.

## II.    Directed Verdicts

When reviewing a decision on a motion for directed verdict, this court's standard of review is the same as the standard used by the trial court in passing upon the motion. ***Underwood v. HCA Health Servs. of Tenn., Inc.,*** 892 S.W.2d 423, 425 (Tenn. App. 1994). Courts reviewing a motion for directed verdict may not weigh the evidence or evaluate the credibility of witnesses. ***Id.***

> In ruling on the motion, the court must take the strongest legitimate
> view of the evidence in favor of the non-moving party. In other words,
> the court must remove any conflict in the evidence by construing it in
> the light most favorable to the non-movant and discarding all

countervailing evidence. The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence. If there is any doubt as to the proper conclusions to be drawn from the evidence, the motion must be denied.

*Eaton v. McLain*, 891 S.W.2d 587, 590 (Tenn. 1994) (citations omitted).

**A.      Whether the court erred in not directing a verdict in favor of AEP as to UBS's cause of action under the Lanham Act, 15 U.S.C. §§ 1114(1), 1125.**

Congress's intent when enacting the Lanham Act was "to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce [and] to protect persons engaged in such commerce against unfair competition." 15 U.S.C. §1127 (1988 & Supp. 1992). The Lanham Act provides in pertinent part as follows:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false description of origin, false or misleading description of fact, or false or misleading representation of fact, which -
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*Id.* §1125(a)(1) (Supp. 1992). Section 1114 of the Lanham Act provides:

> (1) Any person who shall, without the consent of the registrant -
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
> >
> > . . . .
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

*Id.* § 1114(1) (1988 & Supp. 1992).

AEP insists the provisions of the Lanham Act did not apply to the facts of this case because everybody knew the linings were salvaged from a fire in Nashville. AEP relies on *Alfred Dunhill Ltd. v. Interstate Cigar Co.*, 499 F.2d 232 (2d Cir. 1974), for the proposition that the sale of salvaged materials does not violate the Lanham Act. The facts of *Dunhill*, however, are distinguishable from the facts of this case. In *Dunhill*, the lawful owner of the goods at issue voluntarily permitted the insurance company to salvage and sell the goods. *Id.* at 234. In this case, UBS took all the necessary steps in their contract with AEP to ensure that it conveyed no salvage rights in the linings to AEP and that none of the linings would ever be sold as salvage or otherwise. AEP's claim the fact that the purchasers understood the linings were salvaged from a Nashville fire in no way negates the application of the Lanham Act because the goods were not salvage.

AEP's second argument is that UBS was not entitled to monetary damages because the Lanham Act requires a plaintiff to prove actual confusion to receive monetary damages and UBS failed to make such a showing. Assuming actual confusion is a necessary element, it is the opinion of this court that UBS satisfied its burden. To explain, AEP argues "everybody that had any contact with this product knew that it was salvage from a fire or auction in Nashville." Because the linings were not salvage, a person who believed the linings were salvage would have been actually confused. In addition, the record established Gedeck and Hannowsky were actually confused as to other aspects of the transaction. They believed the linings were quality products and did not know UBS had deemed the linings unfit for sale and had contracted with AEP to take them to a landfill. Second, they believed Barr properly obtained the brake linings and had the authority to sell them. To the contrary, Barr could not have had any title to the linings because AEP did not have any title. As explained by the trial court, the contract, as a matter of law, clearly stated AEP had no salvage rights whatsoever to the linings.[5] As a converter, AEP

---

[5] In its memorandum opinion, the trial court wrote:

The defendant AEP puts forth several reasons why this case should not be held an exceptional one. First, AEP is still under the mistaken impression that the goods it traded were salvaged goods. It continues to refer to the brake shoes and brake linings sold by Lee Barr as salvage, citing that "[o]bviously there was no confusion that these were salvaged products . . . ." Def. Reply Brief p.2. The brake shoes and linings were not salvage. They were specifically designated to be properly disposed of in an approved landfill in the contract between AEP and [UBS]. The plaintiff's research department decided that these products were unfit for use and not salvageable. Therefore, the products were not approved for sale, even as salvaged goods.

obtained no title to the linings and could not have transferred any title to Barr. *Goodwin v. Taenzer*, 122 Tenn. 101, 119 S.W. 1133 (1909); *McDaniel v. Adams*, 11 S.W. 939, 940, 87 Tenn. 756, 757-58 (1889). The fact that Gedeck and Hannowsky believed they received quality products and Barr had authority to sell the linings was actual confusion.

It is the opinion of this court that the chancery court did not err in failing to direct a verdict in favor of AEP. There was sufficient evidence in the record such that jurors could reasonably infer actual confusion. Given such evidence, it would have been error for the court to have directed a verdict in AEP's favor.

**B.      Whether the court erred in directing a verdict in favor of UBS and against AEP on the breach of contract claims.**

Taking the strongest legitimate view of the evidence in favor of AEP, the non-moving party, there were three different breaches of the contract between UBS and AEP. UBS breached the contract by interfering with AEP's exclusive control of the facility and by failing to compensate AEP for its services. AEP breached the contract when it failed to take all the linings to a landfill.

"[T]here can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract." *Santa Barbara Capital Corp. v. World Christian Radio Found., Inc.,* 491 S.W.2d 852, 857 (Tenn. App. 1972). "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract. Thus, in cases where both parties have not fully performed, it is necessary for the courts to determine which party is chargeable with the first uncured material breach." *McClain v. Kimbrough Const. Co.*, 806 S.W.2d 194, 199 (Tenn. App. 1990) . The determination of whether a breach is material requires consideration of the following factors:

>        (a) the extent to which the injured party will be deprived of the
> benefit which he reasonably expected;
>        (b) the extent to which the injured party can be adequately
> compensated for the part of that benefit of which he will be deprived;
>        (c) the extent to which the party failing to perform or to offer to
> perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Id.* (quoting Restatement (Second) of Contracts § 241 (1979)).

After applying the law to the facts, it is the opinion of this court that the trial court did not err. To explain, the breach resulting from UBS's failure to provide AEP with exclusive control of the facility was not material. There was no evidence that UBS's actions deprived AEP of the benefits it reasonably expected to receive. In addition, there was no evidence that UBS acted in any manner other than in good faith. UBS's failure to pay and AEP's failure to dump the linings in a landfill were both uncured and material breaches. AEP's breach, however, occurred prior to UBS's. Thus, it follows that the trial court properly granted a directed verdict in favor of UBS and against AEP because AEP could not recover for breach of contract based on conduct occurring after having materially breached the contract itself.

AEP also claims the court should not have directed a verdict because it should have allowed the jury to consider its defense of impossibility of performance. This claim is without merit. "Impossibility of performance caused by the promisor or by those in privity with him, or by developments which he could have prevented or avoided or remedied by appropriate corrective measures, does not exclude him from liability for his nonperformance of the contract." *Tucker v. Hundley*, 452 S.W.2d 658, 660 (Tenn. App. 1969). AEP could have fully preformed the contract and taken the linings to the landfill. Its agents admitted such. It could have had a representative present to control the premises and prevent Lee Barr from taking the linings. There was no impossibility. Any impediment to full performance was of AEP's own making. In such a case, impossibility is no defense. The court properly directed a verdict against AEP.

III.     **Whether the chancery court erred in not granting AEP a new trial.**

AEP claims the court erred in not granting it a new trial for eight different

reasons. We address each reason separately.

## A. There was no proof that AEP violated the Lanham Act.

The proof clearly established AEP violated the Lanham Act. Section 1125(a) makes any misrepresentation of fact which results in confusion as to affiliation, connection, association, source, origin, sponsorship or approval actionable. Here, the evidence established those who purchased the brake linings were not told the following: 1) UBS determined the brake linings were damaged or inferior; 2) UBS intended to send the brake linings to a landfill; 3) AEP converted the brake linings and had no rights whatsoever to them; 4) UBS had taken steps to disassociate itself with the linings such that the linings were to have been buried in a landfill to assure quality control; and 5) the product carried no express or implied warranties by the manufacturer.

> A product is not truly "genuine" unless it is manufactured and distributed under quality controls established by the manufacturer. The Lanham Trademark Act affords the trademark holder the right to control the quality of the goods manufactured and sold under its trademark. "The actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain."

*Shell Oil Co. v. Commercial Petroleum, Inc.* 928 F.2d 104, 107 (4th Cir. 1991) (quoting *El Greco Leather Prods. Co. v. Shoe World*, 806 F.2d 392, 395 (2d Cir. 1986)). The linings Barr sold were not genuine Grey-rock or BT linings according to this definition because they were not distributed under UBS's quality controls. *See id.* Therefore, the purchasers were actually confused as to the genuineness as well as to the origin of the linings.

We are of the opinion UBS proved their claim under the Lanham Act. The arguments of AEP to the contrary fail. AEP's actions prevented UBS from controlling the quality of its goods sold under its trademark and associated UBS with an unapproved, inferior product. UBS had no desire to have their trademark and reputation associated with a product AEP was required to take to the landfill. AEP was responsible for placing unapproved, inferior goods bearing UBS's trademark and other indicia of UBS into the stream of commerce. The verdict of the jury regarding the Lanham Act was in all respects proper given the facts and the law. It was not

error to deny a new trial to AEP on the Lanham Act issue.

**B.    The jury's verdict was inconsistent in that it found AEP had violated the Lanham Act, but also found Lee Barr had not violated the Lanham Act.**

AEP insists the chancery court should have granted a new trial because the jury was "obviously confused" on the Lanham Act claim. AEP has failed to cite any case law for this proposition and did not provide this court with any proof the jury was confused or did not follow the court's charge on the Lanham Act claim against AEP. We have fully discussed the Lanham Act and think it is clear AEP is liable for its violations of the Lanham Act. We find nothing in this record establishing the jury was confused.

**C.    The jury's initial award in the amount of $130,892.00 dollars and its award of punitive damages was improper.**

The jury awarded UBS compensatory damages, attorney's fees, and punitive damages. AEP claims the compensatory damage award was improper because the jury relied solely on the damages proved by UBS for the Lanham Act violation including attorney's fees. AEP also argues the punitive damages were improper because they were based on the jury's compensatory award which was based on the violations of the Lanham Act and the Lanham Act does not provide for punitive damages. Finally, AEP argues the award of attorney's fees was improper.

We find no error in the award of damages. As to the compensatory damages, there is no evidence the jury based its award solely on the Lanham Act violations. At the close of the trial, the court entered a directed verdict in favor of UBS on its breach of contract claim against AEP. In addition, the jury determined on the verdict form that AEP was liable to UBS as a result of AEP's misrepresentation, conversion, and unfair competition. Thereafter, the jury awarded UBS $130,892.00 plus court costs and additional attorney's fees. The award was in response to the following question on the verdict form: "What damages do you award [UBS] against [AEP]?" There is no reason to believe the jury's award was intended to compensate UBS for anything but all of the actions committed by AEP. Moreover, AEP has failed to cite any cases supporting the proposition that the compensatory damages were improper under the

state law claims or the Lanham Act claim.

UBS argues and we agree that punitive damages were appropriate in this case. The jury made the determination UBS was entitled to punitive damages. They determined by clear and convincing evidence that AEP acted intentionally, maliciously, recklessly, or fraudulently, and the trial court agreed. AEP's claim that punitive damages were improper is, in our opinion, incorrect. There was an abundance of proof of fraud, conversion, and other intentional acts by AEP. The court properly charged the jury as to punitive damages and held a proper hearing during which the jury heard applicable financial information. There was no error.

As to the attorney's fees, the court charged the jury as follows:

> Under the Lanham Act, if liability exists, the Court may award attorney fees in an exceptional case. An exceptional case is one wherein the tortuous actions of the defendant are malicious, fraudulent, deliberate or willful. If you find that the actions of one or more of the defendants in this case violated either of the sections in the Lanham Act referred to above, and that such conduct was malicious, fraudulent deliberate or willful, you shall so indicate, for the court's purpose on your jury verdict form.

The jury indicated on the verdict form UBS had established their case against AEP for unfair competition and UBS should recover all attorney's fees. In his memorandum opinion of 26 April 1996, the trial court concluded there was overwhelming proof that AEP acted intentionally, deliberately, and with bad faith. Therefore, the trial court determined this to be an exceptional case under the Lanham Act and awarded attorney's fees. We can find no error.

**D.    The court's instructions as to the directed verdict in favor of UBS confused the jury**

AEP argues the court failed to properly explain to the jury its reasons for directing the verdict on the breach of contract issue. Specifically, AEP contends the court's instructions failed to properly explain the effect of the directed verdict on Barr's misrepresentation claim against AEP. We disagree. The court not only explained why it granted the directed verdict, but made it clear the only issue it decided was the contract issue between UBS and AEP. The chancery court stated:

> I do need to explain one thing to you before we have closing

arguments.            There is a procedure known as a directed verdict in which the Court can decide a particular issue or part of a case or all of the case if the Court determines there are no facts in dispute.  In this case, I have decided that [UBS] has proven its claim against [AEP] on the contract claim, breach of contract.

The contract, you will recall, was that it required [AEP] to take the brake shoes to the landfill.  They did not get to the landfill, for whatever reason, which you'll decide, my conclusion is that that constitutes a breach of the contract and as a result, that claim, you will no longer have to decide, that part of the suit.

Likewise, you will not have to decide the part of the suit in which [AEP] has sued [UBS] for the contract price because having breached the contract itself, [AEP] is not entitled to recover the contract price.  Other than that, all the other parts of the case will be for you to decide.

It is the opinion of this court that these instructions properly informed the jurors of their duties.  In addition, the verdict form included a space for the jury's decision in Barr's misrepresentation claim against AEP and did not contain any questions regarding AEP's and UBS's breach of contract claims.  AEP's argument is without merit.

**E.     The argument of UBS's counsel was erroneous and the conduct of Lee Barr and his relatives during the course of the trial were prejudicial to AEP resulting in a verdict based upon passion, prejudice, and caprice.**

AEP makes the following argument in its brief:

To further compound the ultimate effect of the Court directing a verdict against Defendant AEP the Plaintiff's counsel made a closing argument that was highly prejudicial and totally outside of the record that stated as follows:

I need to talk to you about the damages in this case.  We have proven, we submit, by a preponderance of the evidence, breach of contract <u>which the Court has directed a verdict on, fraud, conversion and unfair competition under the Lanham Act</u> by false designation of origin and trademark infringement without the quality control of the Plaintiffs.  It is for the Plaintiff to determine that specific quality control.  They did so and the Defendants actions violated the Lanham Act. (emphasis added)

AEP argues the underlined language "was so highly prejudicial and inaccurate the Court should have granted a new trial in this cause."  It is the opinion of this court that the language quoted above is not misleading particularly if the underlined portion is read in conjunction with the rest of the sentence.  Once the entire sentence is read, it becomes clear UBS's attorney was simply stating UBS had satisfied its burden as

to all of the claims and the court had directed a verdict as to one of those claims. Such a statement is neither inaccurate nor highly prejudicial.

AEP also contends the actions of Lee Barr and his family prejudiced AEP's case. Specifically, AEP argues on one occasion Reeves noticed the Barr's carrying on a conversation with a juror about a mutual friend. AEP claims: "In view of this verdict an inference can be drawn that this type of improper contact with the jury was prejudicial to AEP." We do not believe such an inference can be so easily drawn. We find nothing in this record to suggest that the jury rendered a verdict based upon passion, prejudice, or caprice. To the contrary, we are of the opinion the jury verdict was in all respects fully supported by the evidence.

**F.      The evidence as to the damages sustained from loss of profit by UBS was entirely speculative.**

"[L]ost or expected profits are recoverable as damages for breach of contract, provided, they can be proved with reasonable certainty, and are not in fact remote or speculative." ***Morristown Lincoln Mercury, Inc. v. Lotspeich Publishing Co.***, 42 Tenn. App. 92, 102, 298 S.W.2d 788, 793 (1956). It is undisputed that for purchasers to obtain BT or Gray-rock linings other than those AEP converted, the purchasers would have had to purchase the linings through an authorized distributor of UBS. It is also undisputed that UBS would have manufactured and sold those linings. Thus, the sales of the linings which AEP converted and which were not recovered displaced other UBS sales.

UBS presented proof regarding its inventory system at trial. The last inventory taken prior to the fire was admitted in evidence and inventory documents were referred to by Halliburton. The testimony revealed that on Saturday there were 51,440 linings to be taken to the landfill and on Wednesday there were approximately 3,200 linings at the front of the building. UBS recovered 19,220 linings from Gedeck and Barr, but never recovered the remaining 29,020 linings. Additionally, UBS never recovered 200 pairs of complete heavy duty brake shoes which Barr sold to Russell's Trailer Sales. There was clear and competent evidence regarding the average price per set, the percentage profit, and the net profit per set. This evidence proves with

sufficient certainty the amount of lost profits. Finally, the court charged the jury as to the law of lost profits under the Lanham Act. The court specifically instructed the jury that speculative damages were not permitted. He stated: "You are not permitted to award a party speculative damages, which means compensation for future loss or harm which, although possible, is conjectural or not reasonably certain." The court charged the jury that UBS had the burden of establishing by a preponderance of the evidence all facts necessary to prove their claims and damages.

Moreover, we find no merit to AEP's argument that no consideration was given to the fact that some linings were at the facility on Wednesday, 28 July 1994. Halliburton testified that there were approximately 3,200 linings in the facility on 28 July and that UBS's computation of lost profits assumed AEP took 3,200 linings to the landfill. The truck drivers testified on behalf of AEP and presented no evidence to contradict Halliburton's testimony. AEP's arguments are without merit.

### G. There was no proof in the record to support the jury's verdict of $25,000.00 in favor of Lee Barr

It is AEP's contention that the trial court erred in not granting it a new trial or a remittitur because the jury's verdict "was totally speculative and not founded on any evidence in the record." "Courts are encouraged to exercise caution in ordering a new trial based on the size of a jury verdict and should, if at all possible, utilize the remedy of remittitur." *Thrailkill v. Thrailkill*, 879 S.W.2d 836, 840 (Tenn. 1994). The chancery court correctly denied Plaintiffs' motion for a new trial on this issue, however; it is the opinion of this court that the chancery court should have entered a remittitur. When reviewing a jury award approved by the chancery court this court follows the standard of review set forth in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *Id.* at 841, 843; *see Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 640 (Tenn. App. 1993). That rule provides:

> (d) Findings of Fact in Civil Actions. Unless otherwise required by statute, review of findings of fact by the trial court in civil actions shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict.

Tenn. R. App. P. 13(d) (West 1996).

"The proper measure of damages for fraud is that the injured party should be compensated for actual injuries sustained by placing him or her in the same position he or she would have been had the fraud not occurred. A plaintiff who alleges fraud bears the burden of proving damages." *Harrogate Corp. v. Systems Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. App. 1995) (citations omitted). The evidence revealed the following. Barr purchased the grade-all given to Reeves pursuant to the trade between Reeves and Barr for approximately $10,500.00. Barr testified the value of the grade-all was between $25,000.00 and $30,000.00. Reeves valued the grade-all at $18,000.00. Pursuant to the trade, Barr received certain tools and $16,000.00 from the sale of a tow motor and the brake linings. Finally, Barr and his daughter testified that the Barr's and eight employees worked many hours removing items from the facility. In addition, Barr testified that he incurred additional damages when the frame to one of his trucks broke under the weight of the linings.

Thus, assuming the grade-all was worth $30,000.00, Barr lost $14,000.00 from the trade and incurred certain other expenses. The problem is neither party has cited any portions of the record which evidence the amounts of these other expenses.[6] From Barr's testimony we know that he and his family gave up their time, he had employees to compensate, and had to pay for truck repairs. The problem is that neither this court, the chancery court, nor the jury knew the value of these expenses. In other words, Barr's damages were $14,000.00 plus "X," and the jury determined "X" equaled $11,000.00. It is the opinion of this court that there is no material evidence in the record to support this finding and the chancery court erred in not entering a remittitur.

### H. The court failed to charge the jury with AEP's request number four.

AEP's final argument is the court should have granted it a new trial because it failed to charge the jury with AEP's fourth request. AEP argues its fourth request "would have in part given some explanation of the Courts [sic] action in directing the verdict." It is the opinion of this court that any error on the part of the chancery court

---

[6] "This Court is not under any duty to minutely search a voluminous record to locate and examine matters not identified by citation to the record." *England v. Burns Stone Co.*, 874 S.W.2d 32, 35 (Tenn. App. 1993).

in failing to charge the jury with AEP's fourth request is harmless. To explain, given our conclusion as to AEP's other issues, it is clear the chancery court's instructions to the jury sufficiently explained the jurors' duties. Thus, it was not necessary to provide any further explanation. If there were any error, it was harmless and not a basis for a new trial. *See* Tenn. R. App. P. 36(b).

## IV. Conclusion

Therefore, it results that the judgment of the chancery court is affirmed in part, reversed in part, and remanded. On remand, the chancery court shall enter a remittitur reducing the award to Lee Barr by $5,000.00. Costs on appeal are taxed to defendant/appellant, American Environmental Protection, Inc., and defendant/appellee, Lee Barr.

_____
SAMUEL L. LEWIS, JUDGE

CONCUR:

_____
HENRY F. TODD, P.J., M.S.

_____
BEN H. CANTRELL, J.