IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 17, 2011 Session

## BOBBY D. WALL v. SELMA CURTIS

**Appeal from the Chancery Court for Montgomery County**
**No. MCCHCVCD084      Laurence M. McMillan, Jr., Chancellor**

**No. M2011-01285-COA-R3-CV - Filed April 23, 2012**

Homeowner and Contractor entered into an agreement for the construction of a new house. The contract provided that no changes would be made to the terms and specifications of the contract without a writing describing the changes signed by both parties. The parties ignored this provision and made changes without preparing change orders. Before the house was completed the parties had a dispute, and the homeowner contracted with someone else to complete her house. Homeowner alleged Contractor breached the contract by walking off the job and refusing to complete the house, and Contractor alleged Homeowner fired him and told him not to return to her property. Contractor sued Homeowner for breach of contract and sought to recover his damages, which included expenses he incurred for materials and labor that Homeowner refused to pay. Homeowner counterclaimed for breach of contract and sought to recover as damages the amount she paid other contractors to complete her house. The trial court found Homeowner committed the first breach and entered judgment for Contractor in the amount of $21,120.69. Homeowner appealed, arguing the evidence did not support the trial court's judgment. Concluding the evidence supports the trial court's findings of fact, we affirm the trial court's judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Selma Curtis.

Steven T. Atkins, Clarksville, Tennessee, for the appellee, Bobby D. Wall.

# OPINION

## I. BACKGROUND

Selma Curtis owned a parcel of real estate in the Bradbury Farms Subdivision in Montgomery County, Tennessee. She entered into an agreement titled "Construction Contract" (the "Contract") with Bobby D. Wall, dated February 12, 2006, in which Mr. Wall agreed to build Ms. Curtis a house for the price of $234,900. The Contract included details about the types of doors, windows, flooring, and trim that would be used in the house, and had an "Allowance Summary" that specified how much Ms. Curtis could spend for particular items, such as cabinets, appliances, floor coverings, brick, plumbing, and fixtures, in order to stay within the Contract price.

The Contract included the following statement in paragraph 3: "Buyers understand overages will be paid to Contractor if they exceed specific allowances as set by Contractor." Paragraph 4 provided in part:

> That no changes from the original plans and specifications in this contract shall be made unless both parties agree in writing as to the extent of any changes and the amount to be charged or deducted for those changes, before any materials are purchased or work connected with those changes shall be done.

Mr. Wall began constructing the house in March 2006, but by July the parties' relationship had soured and Mr. Wall discontinued his work on Ms. Curtis's house. Mr. Wall claimed Ms. Curtis terminated the Contract by telling him not to come onto her property anymore and that she would complete the house on her own without him. Ms. Curtis claimed Mr. Wall walked off the job leaving the house half completed and that she waited months for him to return to complete the job.

By the time of the parties' dispute Ms. Curtis had paid Mr. Wall a total of $158,000. Mr. Wall claimed he had incurred additional expenses on behalf of Ms. Curtis, however, and he filed a lawsuit against Ms. Curtis in an effort to recover this money. In his lawsuit, Mr. Wall asserted Ms. Curtis breached the parties' contract and that he was entitled to damages of $54,316 from Ms. Curtis for unpaid materials and work, some of which resulted from Ms. Curtis's change orders.

Ms. Curtis responded to Mr. Wall's Complaint and denied that she terminated the Contract. Ms. Curtis filed a Counter Petition in which she contended Mr. Wall failed to fulfill the obligations imposed upon him by the Contract and that his failure constituted a breach for which she was entitled to damages. Ms. Curtis alleged she had to engage other

contractors to perform the tasks Mr. Wall was obligated to perform under the Contract and that she suffered damages in the amount of $124,226.

The case was tried without a jury in August and November 2010. Mr. Wall and Ms. Curtis presented conflicting testimony regarding the circumstances surrounding the Contract's termination. Mr. Wall testified that beginning in the spring of 2006 Ms. Curtis was directing his subcontractors to change certain features of the house without letting Mr. Wall know of the changes first. Mr. Wall testified that Ms. Curtis told his subcontractors she would pay them for the extra work, but that once the extra work was done she refused to pay anything more than was in the Contract. Mr. Wall testified that he tried to have Ms. Curtis sign change orders whenever she made a change from the contract terms, but that she refused to sign any change orders.

Mr. Wall testified that by July 20, Ms. Curtis was making so many changes to the terms of the Contract that he sent her a proposed Addendum to Construction Contract in an effort to quantify the changes and make sure Ms. Curtis knew she would be responsible for paying for the changes she had made and for additional changes going forward. Mr. Wall stated "There will be no more changes unless a written agreement, as per the contract, is signed with the agreed cost change stated." In addition, Mr. Wall explained that Ms. Curtis would be responsible for paying the cost of all cabinets and vanities over and above the $5,000 allowance set forth in the Contract. Mr. Wall also made clear Ms. Curtis would be responsible for paying $4,675 to cover the cost of the extra brick and labor necessary to install brick on a part of the house that the parties initially agreed was going to be covered in vinyl. Lastly, Mr. Wall stated that Ms. Curtis would be responsible for paying the cost of all trim materials in excess of the $5,085 budgeted for trim in the Contract.

Ms. Curtis sent Mr. Wall a response at the end of July in which she agreed to stay within the $5,000 budgeted for cabinets and vanities. She stated that she would pay $3,400 for extra brick work, not the $4,675 Mr. Wall requested. Ms. Curtis refused to pay anything extra for the trim materials, stating that "[t]hese items should be constructed, to the Owners satisfaction, by the Contractor under the original contract at no additional cost to the Owner."

Mr. Wall testified that following Ms. Curtis's letter at the end of July, Mr. Wall did not hear from Ms. Curtis again. Mr. Wall testified that his subcontractors informed him that Ms. Curtis told them she would be in charge of the construction going forward. Mr. Wall's attorney sent Ms. Curtis a letter stating Mr. Wall "remains ready, willing, and able to complete construction" and that he "anticipate[s] that it would approximately take 30 days to complete the improvements provided he receives your cooperation." Mr. Wall testified that Ms. Curtis phoned him at the end of September and said to him, "Bobby, I told you not to come back on my job. I told you last week. I'm going to cut you up. I'm going to kill

-3-

you."

Ms. Curtis agreed during her examination at trial that she made changes to the Contract without a written change order. She explained that she was getting along so well with Mr. Wall it did not seem necessary to have a written change order. When asked about the changes in trim that she insisted on, she explained that she did not understand what was set forth in the Contract regarding the trim and that she was not happy with the terms she had agreed to initially.

When Ms. Curtis was asked what happened after she and Mr. Wall exchanged letters in July, Ms. Curtis testified:

> Well, first of all, we come to this point and Mr. Bobby was - - all the changes he was doing and we were talking, and he just kind of started threatening me. That's when it came to this point.
>
> He would - - every time I was saying something I wanted to see what he was doing, and he [would] tell me that he's going to quit. He left. I call[ed] him. I begged him to come back. I told him I won't do that. I wanted him to do that. Well, then he just said okay. He wanted me to take the responsibility of the house, as-is, and don't ask any more. Just accept the way it is.

## II. TRIAL COURT'S FINDINGS OF FACT

Both Mr. Wall and Ms. Curtis submitted Proposed Findings of Fact and Conclusions of Law following the trial. The trial court issued an Order on March 29, 2011, in which it found as follows:

1.    That the Findings of Fact and Conclusions submitted by the Plaintiff, Bobby D. Wall, are adopted by the Court in their entirety.

2.    That the Plaintiff, Bobby D. Wall, is entitled to recover against the Defendant, Selma Curtis, for the following unpaid items:

    a.    Additional materials for field lines $468.00, additional equipment time for septic tank and field lines $1,470.00, charges for moving water line $2,000.00, charges for moving driveway $4,000.00, additional equipment and labor on foundation $2,360.00, additional block and labor for foundation $2,060.00,

-4-

engineering charges $275.00, additional brick work $4,675.00, work on front steps after final draw $2,080.00, incidental charges for port-a-potties, construction utility services, and builder's risk insurance $1,732.69, for a total of $21,120.69.

3. That the counter claim of the original Defendant, Selma Curtis, should be dismissed.

The relevant Findings of Fact that the trial court adopted include the following:

3. Due to the presence of rock and the slope of the property the lot was a difficult one on which to construct a house due to septic tank regulations.

. . . . .

12. The parties entered into construction contract on February 12, 2006 memorializing the parties' agreement and setting forth various allowances and specifications for the construction of the house.

. . . . .

21. The elevation of the house and its location on the lot were dictated by septic system requirements.

22. Additional expenses for site work due to rock were incurred by Mr. Wall as follows:

Additional materials
Additional equipment time $1,470
Relocate water line
Relocation of driveway $4,000.00

23. Due to the presence of rock Mr. Wall expended the following amounts to avoid blasting:

a. Extra concrete block and brick $2,060.00
b. Additional equipment and man power time on foundation $2,360

24. Mr. Wall discovered the necessity of raising the house when the

lot was being graded and found it would be necessary to either dynamite rock at extra expense or raise the elevation of the house.

. . . . .

26.     Mr. Wall incurred additional unpaid engineering charges in the amount of $275.00 for a change order proposed by Ms. Curtis.

27.     Mr. Wall incurred extra costs for additional brick as a result of a change order from vinyl siding to brick, with Ms. Curtis agreeing to pay $3,400.00 for the extra brick.  These charges have not been paid.

. . . . .

29.     After being terminated by Ms. Curtis, Mr. Wall continued to furnish water service, electric service, porta potties, and builder's risk insurance through December of 2006 at a total expense to Mr. Wall of $1,732.69 for which he has not been reimbursed.

30.     Ms. Curtis has no evidence to dispute Mr. Wall's testimony that he paid for the portable toilets, builder's risk insurance, construction electric service, and water service from July 31st until December 31st of 2006.

31.     Although numerous changes from the plans occurred during construction, no written change orders were signed.

32.     In early July, the parties began discussions concerning previous change orders as well as trim for the interior of the house and a disagreement occurred as to the quality and quantity of trim dictated by the contract.

33.     After Ms. Curtis directed certain changes to subcontractors with respect to arches and trim components without consultation with him, Mr. Wall prepared an addendum to the parties' contract in an attempt to resolve the parties' disagreements.

. . . . .

35.     The total amount expended by Mr. Wall for labor and materials incurred prior to or in existence at his termination was $137,415.12.

. . . . .

37.     After his last draw, Mr. Wall expended labor and materials on the front steps costing $2,080.00 for which he was not paid.

. . . . .

42. Randy Meyer, a material salesman at Thomas Lumber Company, testified that in early July of 2006 Mr. Wall and Ms. Curtis discussed trim with him at Thomas Lumber Company. Mr. Wall had him show Ms. Curtis trim such as Mr. Wall normally used in houses but that Ms. Curtis wanted an upgraded trim package beyond that provided in her contract.

. . . . .

44. On July 7, 2006, Mr. Meyer also provided a quote on behalf of Thomas Lumber Company for an upgraded trim package incorporating Ms. Curtis' desired trim at a cost for materials of $10,253.00. On July 20, 2006 Ms. Curtis ordered the materials set out in Trial Exhibit 12 reflecting upgraded trim and on or about July 20th Ms. Curtis informed Mr. Meyer that Mr. Wall was not going to be building her house anymore and that she was going to finish it herself.

45. Mr. Meyer testified that all of the trim purchased by Ms. Curtis after Mr. Wall was no longer on the job was an upgrade over the contract specifications.

46. Despite verbal and written communications between the parties between July 20th and July 31st to the contrary, Ms. Curtis testified she was willing to pay for the trim upgrade but in her last written communication to Mr. Wall on July 31st refused to pay for the trim upgrade.

. . . . .

48. David Aldridge, who plumbed the house testified that Ms. Curtis directed him to make several changes to include moving a half bath on the main floor twice.

. . . . .

62. That Ms. Curtis exceeded her contract allowances in the following respects:

  a. All expenses for rock removal
  b. Cabinet allowance exceeded in the amount of $3,670.42

c.      Door hardware allowance exceeded in the amount of $516.47

d.      Hardwood floor allowance exceeded in the amount of $278.10

e.      Exterior doors allowance exceeded in the amount of $86.43

f.      Appliance allowance exceeded in the amount of $121.11

. . . . .

71.      After terminating Mr. Wall, Ms. Curtis finished a different house than the one for which she contracted.

Ms. Curtis filed a Motion to Alter or Amend Order in which she argued the evidence presented at trial did not support the court's findings and order that she pay Mr. Wall $21,120.69. The trial court found that Ms. Curtis's motion was not well taken and denied it. This appeal followed.

## III. ANALYSIS

### A. Standard of Review

Ms. Curtis argues on appeal that the trial court erred in finding she was liable to Mr. Wall for damages because Mr. Wall was the first to materially breach the parties' contract. Our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Hass v. Knighton,* 676 S.W.2d 554, 555 (Tenn. 1984). We review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

The interpretation of a written agreement is a question of law rather than one of fact. *Cracker Barrel*, 284 S.W.3d at 308 (citing *Guiliano v. Cleo*, 995 S.W.2d 88, 95 (Tenn. 1999)). Our review of the trial court's conclusions of law are therefore *de novo*, with no presumption of correctness accorded to the decisions of the court below. *Cracker Barrel*, 284 S.W.3d at 308 (citing *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005)).

### B. The Record Supports the Trial Court's Finding that Ms. Curtis First Breached the Contract

The law in Tennessee is well established that the party who first commits a material

breach of a contract is not entitled to any damages resulting from the other party's subsequent breach of the same contract. *Forrest Constr. Co. v. Laughlin*, 337 S.W.3d 211, 226 (Tenn. Ct. App. 2009); *United Brake Systems, Inc. v. American Envtl. Protection, Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997); *see Santa Barbara Capital Corp. v. World Christian Radio Found.*, 491 S.W.2d 852, 857 (Tenn. App. Ct. 1972) (holding there can be no recovery for damages by breaching party in breach of contract action).

Ms. Curtis and Mr. Wall presented conflicting testimony about which party first breached the Contract. They both contended the other breached the Contract by making changes to the house that were not contemplated by the Contract and that were not memorialized in a writing signed by both parties. Despite the requirement in the Contract that no changes were to be made to the plans or specifications of Ms. Curtis's house without a writing signed by both parties, Mr. Wall's and Ms. Curtis's conduct amounted to a modification of this requirement to the extent both parties agreed to changes without a signed writing. "After a written contract is made, it may be modified by the express words of the parties in writing, as well as by parol.*" Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990) (citing *Co-Operative Stores Co. v. United States Fidelity & Guaranty Co.*, 195 S.W.177, 180 (1917)). "Whether written or oral, modifications of written contracts must be with the consent of both parties." *Galbreath*, 811 S.W.2d at 92 (citation omitted).

Until Mr. Wall prepared the Addendum in which he described the more substantial changes Ms. Curtis wanted and documented the additional money Ms. Curtis would have to pay for these changes, both Ms. Curtis and Mr. Wall consented to the changes made orally to the Contract. The Tennessee Court of Appeals addressed a written change order requirement in a construction contract and the parties' waiver of this requirement in *Moore Constr. Co. v. Clarksville Dept. of Elec.*, 707 S.W.2d 1 (Tenn. Ct. App. 1985):

> Including a written change order requirement in a construction contract is not uncommon. It promotes a more definite understanding between the parties and thus, helps to avoid potential controversies. . . . However, like other contractual provisions, they can be waived or abrogated by the parties.
>
> The waiver of a written change order requirement by an owner is not always required to be in writing but may be the result of the parties' conduct on the job. Thus, it is not uncommon for courts to find that an owner has waived a written notice requirement in cases where extra work has been ordered verbally by the owner or the extra work has been performed with the owner's knowledge and without its objection.

*Id.* at 12-13 (citations and footnote omitted). The *Moore Constr. Co.* court explained further:

The course of dealing between the parties can also amount to a waiver where the conduct of the parties makes it clear that they did not intend to rely strictly upon a contract's written notice requirement and that adherence to such a requirement would serve no useful purpose. . . . Once a party has waived the requirement with regard to a particular matter, it cannot revoke its waiver, in whole or in part, at its convenience.

*Id.* at 13 (citations omitted); *see M.R. Stokes Co., Inc. v. Shular*, 2008 WL 544665, at *4 (Tenn. Ct. App. Feb. 26, 2008) ("contract provisions can be waived, especially in construction projects because of the nature of construction which often require decisions to be made quickly to keep the project progressing"); *Vakili v. Hawkersmith*, 2001 WL 1173285, at * 5-7 (Tenn. Ct. App. Oct. 5, 2001) (despite contract provision that change orders were to be in writing signed by the parties, court held parties' conduct waived written requirement). Thus, as to the changes Mr. Wall and Ms. Curtis agreed to orally, neither party can now complain the other breached the Contract by failing to comply with the written change order provision set forth in the Contract.

Besides the absence of written change orders, both Ms. Curtis and Mr. Wall assert other conduct that constituted the first material breach of the Contract. Mr. Wall contends Ms. Curtis breached the Contract when she told him not to come back onto her property before the house was completed. Ms. Curtis denied that she instructed Mr. Wall not to return to her house, arguing instead that Mr. Wall breached the Contract by walking off the job.

The trial court found that Ms. Curtis had fired Mr. Wall and thereby first breached the Contract. The trial court made extensive and detailed findings of fact. We have reviewed the transcript of the trial court proceedings and conclude the testimony and evidence support the trial court's findings of fact and do not preponderate otherwise. Consequently, we conclude Ms. Curtis committed the first material breach of the Contract and is required to compensate Mr. Wall for his resulting damages.[1] Ms. Curtis does not contest the amount of damages the trial court ordered her to pay. The record supports the amount of damages the court ordered Ms. Curtis to pay to Mr. Wall. We therefore affirm the trial court's judgment.

---

[1]Ms. Curtis argues in her Brief that the Contract was ambiguous and should be construed against Mr. Wall, who authored the Contract. Ms. Curtis fails to point to any particular ambiguity in the Contract, however. We therefore decline to consider this argument.

## IV. Conclusion

For the reasons stated above, we affirm the trial court's judgment in all respects. Costs of this appeal shall be assessed against the appellant, Selma Curtis, for which execution shall issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE