IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 6, 2018 Session

## THE MANOR HOMES, LLC v. ASHBY COMMUNITIES, LLC, ET AL.

**Appeal from the Chancery Court for Williamson County**
**No. 41081      Deanna B. Johnson, Chancellor**

_____

### No. M2017-01369-COA-R3-CV

_____

This is a contract dispute between the developer and the builder of a residential property. The developer claimed that the builder was not in compliance with the terms of the contract and removed the builder from the project. The trial court found that the developer breached the contract first by removing the builder from the property without providing it with an opportunity to cure the problems the developer identified and awarded damages to the builder. The developer appeals the decision by the trial court, and we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Phillip Byron Jones, Nashville, Tennessee, for the appellants, Ashby Communities, LLC and John Powell.

Casey Adam Long, Franklin, Tennessee, for the appellee, The Manor Homes, LLC.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves the construction of a house in Arrington, Tennessee. Ashby Communities, LLC ("Ashby Communities") was the developer and owner of a piece of property referred to as Lot 239, and John Powell was its sole member and manager. Michael Cude was the builder on Lot 239, and disagreements that arose between Mr. Powell/Ashby Communities and Mr. Cude form the basis of this lawsuit.

Mr. Cude was a long-time friend of Mr. Powell's brother, JP Powell ("JP"). Mr. Cude had built his own house with the help of Paul Brown, who had a general contractor's license, and Mr. Powell learned from JP that Mr. Cude was interested in building the house on Lot 239. Mr. Cude's wife at the time, Tracy Lytle, set up a company called The Manor Homes, LLC ("Manor Homes") in April 2010, and Mr. Cude treated Manor Homes as his company for purposes of working as a builder in the construction industry. Mr. Powell met with Mr. Cude at different times in 2010 and 2011, and the two men ultimately agreed that Mr. Cude, with the help of Mr. Brown, would build the house on Lot 239 starting in the spring of 2011.

Mr. Powell prepared an agreement titled "Profit Sharing Agreement – Kings' Chapel Subdivision" ("the PSA" or "the agreement") that the parties signed on March 23, 2011. Mr. Powell testified that he revised another document he had to create the PSA. The record contains no evidence that anyone other than Mr. Powell participated in the drafting of the PSA. The signatories to the agreement included Mr. Cude, on behalf of Manor Homes, and John Powell, in his personal capacity and on behalf of Ashby Communities.

In the section of the PSA called "Profit Sharing Understanding," the parties agreed to use a software program called Lodis to track expenses of the project and to pay invoices relating to the construction of the house. Ashby Communities and Mr. Powell agreed to open a checking account at Synergy Bank, with checks to "be titled as 'The Manor Homes, LLC' so that all vendors recognize payments." Manor Homes agreed to deposit $20,000 in this account, "which funds shall be returned to Builder when house has obtained a C.O.[1] or Developer is satisfied with completed house."

Ashby Communities, Mr. Powell, and Manor Homes also agreed in this section of the agreement to a "non-equity net profit sharing agreement on the sale of the house based upon a 50/50 division of net profits between Builder and Developer." Ashby Communities and Mr. Powell had "sole discretion" to determine the price at which the house would be sold, and Manor Homes "specifically waive[d] any rights to impede, lien, impair or delay any closings of the property described herein and/or to attach the proceeds thereof."

Mr. Cude started on the project to build the house on Lot 239 in May 2011. He testified that he and Mr. Powell had some disagreements at the beginning of the project regarding (1) whether the topsoil had to be removed before the footings were poured and (2) which lumber supplier to use. Once they resolved those issues, Mr. Cude testified that the project moved ahead smoothly until January 2012. Mr. Powell agreed that he did not express any concerns about the house after these initial two issues were resolved until January 2012.

---

[1]As used in the PSA, "C.O." refers to a certificate of occupancy.

In late January 2012, Mr. Brown informed Mr. Cude that "there was a lot of activity surrounding the trim out at our house on lot 239." By this time, the house on Lot 239 was in the final stages of construction, with tile, bathtubs, and appliances being installed, walls being painted, and fixtures being hung. Mr. Cude was not aware of any third parties who were or should be involved in the project, so he sent Mr. Powell an e-mail to find out what was going on. Mr. Powell responded to Mr. Cude by e-mail, and he explained that he had hired two independent designers who told him "there are problems with the house." Mr. Powell specified that "[e]lements of design and colors are just not working . . . ." Mr. Powell continued:

> I have asked Paul [Brown] to halt ALL tile work [--] this includes laundry room, all bathrooms, and fireplaces. Please do not have any other paint continue anywhere upstairs, if they are not done removing tape putting doors back etc. stop them – [w]e feel almost the entire 2nd floor needs [to be] repainted.

Mr. Cude testified that this was the first he had heard of any concerns Mr. Powell had with the house since the initial hiccups regarding the topsoil and lumber supplier. Mr. Cude asked for a meeting, and the two met at the house on January 29, 2012, at which time Mr. Powell pointed out his concerns. Mr. Cude testified that he was then "separated from the project." Mr. Cude explained that he wanted to know specifically what Mr. Powell believed was wrong with the house so he could fix it, but Mr. Powell did not return Mr. Cude's phone calls or e-mails, and Mr. Cude was not able to resume working on the house. Mr. Powell also failed to approve for payment the last batch of invoices Mr. Cude submitted, which included subcontractors' work and other project-related expenses. Mr. Cude paid from his own funds outstanding invoices that exceeded $20,000 when he realized Mr. Powell was not going to approve these payments.

The house on Lot 239 was ultimately completed by a third-party contractor. A purchase and sale agreement for the house was signed on September 5, 2012, and the agreed-upon price was $574,500. A certificate of occupancy was obtained on October 26, 2012, and the house closed some time thereafter.

Manor Homes initially filed a complaint in June 2012, which it amended in August 2012 and again in May 2013. The second amended complaint named John Powell and Ashby Communities as defendants. Manor Homes claimed the defendants "constructively ejected and excluded" Manor Homes from the construction project in January 2012 and that they breached the PSA by interfering with Manor Homes' performance of its responsibilities under the agreement. Manor Homes asserted that the PSA constituted a partnership. Manor Homes sought the following relief: (1) the appointment of a receiver to secure and marshal the assets of the project; (2) an accounting by the defendants of all money they have had or that is related to the project or the appointment of a special master for this purpose; (3) an impoundment of all

proceeds from the sale of Lot 239; (4) a declaration of the rights, responsibilities, and status of the parties, including the parties' respective interests in the net proceeds of the project; (5) an award of damages resulting from the defendants' breach of the PSA; and (6) an award of Manor Homes' attorney fees and costs.

Ashby Communities and John Powell filed an answer and counterclaim, which they later amended. Ashby Communities and Mr. Powell added Mr. Cude as a counter-defendant and asserted in their amended counterclaim that (1) Manor Homes and Mr. Cude committed fraud by knowingly representing and warranting that Manor Homes was a licensed general contractor in Tennessee, when it was not so licensed; (2) Manor Homes breached the PSA by misrepresenting itself as a licensed general contractor, failing to complete the home on Lot 239, and failing to perform the work actually completed in a workmanlike manner; (3) Manor Homes and Mr. Cude engaged in conspiracy and malicious interference with Ashby Communities and Mr. Powell's contract to sell the house by filing a lis pendens against the property; (4) Manor Homes and Mr. Cude engaged in slander of title by filing a lis pendens against the property; and (5) Manor Homes and Mr. Cude violated the Tennessee Consumer Protection Act by misrepresenting themselves as licensed general contractors.[2]

This case was tried over a period of three days in December 2016. The trial court issued a Memorandum and Order in June 2017 that included twenty-two pages of findings of fact. The court's findings of fact include the following, *inter alia*:

> Paul Brown ("Brown") specializes as a framing subcontractor and has occasionally worked as a general contractor on several residences including the former home of Cude and Lytle. At the time of trial, Brown had worked in construction for 37 years and had been the general contractor on six houses.

> The purpose of Manor Homes was to hire and direct subcontractors to build homes with the assistance of an associated general contractor. Cude, in conjunction with Brown and Lytle, developed the idea for Manor Homes as a means for supporting Cude during retirement. . . . Lytle, who had a personal interest in home decoration, would be the sole member, and Cude would help direct Manor Homes' day-to-day operations, including hiring subcontractors as well as managing Manor Homes' financial obligations.

---

[2]Ashby Communities and Mr. Powell also named Paul Brown as a defendant in their counter-claim and asserted additional claims against him. Mr. Brown is not involved in this appeal, however, so we will not address the claims made against him or the trial court's resolution of those claims.

Cude believed that Manor Homes could not construct a home without a general contractor. Cude knew that Brown had a general contractor's license based on prior conversations between the two during construction of Cude's home. Cude contacted Brown to gauge Brown's interest in serving as the general contractor for Manor Homes in this opportunity with Ashby.

. . . .

Powell, Cude, Brown, JD Powell, and a financial consultant for Powell and/or Ashby met at a hotel to discuss the potential business opportunity of constructing a home in King's Chapel under the authority of Ashby. Cude, Brown, and Defendant Powell agreed that Manor Homes, Brown, and Ashby could act in a tripartite manner to construct a home on Lot 239, a lot that Ashby had the ability to purchase in King's Chapel. Manor Homes would hire the subcontractors, purchase the building materials, and make decorative selections. Brown would be the day-to-day building superintendent and general contractor in charge of directing the subcontractors on building the home. Finally, Powell and/or Ashby would make the lot accessible to . . . Manor Homes, Brown, and their subcontractors. Additionally, Powell and/or Ashby would put up the money to purchase Lot 239, secure bank loan financing to fund the project, and authorize disbursements for payments to Manor Homes to be withdrawn from Ashby's bank account. The end goal would be for both Ashby and Manor Homes to share equal profits from the sale of the completed home on Lot 239.

Initially, the discussion of a potential budget was for a targeted amount less than $400,000. However, Brown stated that this amount was impossibly low. Brown countered instead that he could do the project for $415,000. Powell indicated that this amount would be acceptable and that the budget would be $415,000 as offered by Brown. However, it became apparent during this meeting at the hotel that Brown did not have the necessary monetary limits, as his were only $1[62],000. Powell stated that Brown's limits would have to be raised and verbally directed Brown to do so. Brown assured Powell that he would take whatever steps necessary to raise his monetary limits.

Following this meeting at the hotel, Cude and Brown set out to get Brown's monetary limits raised. Brown told Cude the ways to accomplish this limit raise. One way Brown proposed this could be accomplished would be to expedite the process by sending a "hardship letter" to the

TBLC.[3] Cude placed money in an account with Brown to support his "hardship" request. Sometime thereafter, the TBLC authorized a limits increase on Brown's license.

. . . .

Finally, on March 23, 2011, Manor Homes and Ashby signed a document titled "Profit Sharing Agreement" ("PSA") with the intention of memorializing the agreement to build a home on Lot 239. Powell drafted the PSA by editing an agreement from another project. The PSA amounts to nine total pages.

. . . .

Once the project finally got started, things were fine for the next six months. Powell had always said the budget and the time line were important, but Powell stated that the budget was most important. According to Cude, JD Powell, and Brown, the time was never a huge concern with Powell. Every two weeks, on Sunday afternoon, Cude processed all of the outstanding subcontractor invoices for labor and materials and uploaded the information into Lodis. Afterwards, Ms. Lytle would go to Lodis, ensure the expenses contained in the spreadsheets got processed, and then would give the checks to Powell to be signed.

As General Contractor, Brown obtained building permits, took invoices from the subcontractors, and delivered the invoices to Cude. Also, Brown made sure the subcontractors had the materials they needed. If they did not, Brown would tell Cude. Brown supervised the subcontractors and made sure they did their jobs.

Ms. Lytle was making the design decisions. Powell directed Ms. Lytle as to with whom she should work. Cude understood that the design decisions were up to him and Ms. Lytle. Cude considered those decisions to be part of Manor Homes' job. Decisions about appliances and fixtures were up to Manor Homes.

Between late June of 2011 and late January of 2012, Powell did not express any concerns about the way the house was being built.

According to JD Powell, Cude, and Brown, Powell's attitude took an abrupt about-face in January of 2012. At trial, there was much disagreement

---

[3]"TBLC" refers to the Tennessee Board for Licensing Contractors.

- 6 -

between Powell, Cude, JD Powell, and Brown as to the level of completion in the home at the time of this dispute. According to JD Powell, Cude, and Brown, the home was about $8,000 under budget according to the Lodis spreadsheets at that time, and the home was 90-95% complete. Cude and Brown admitted that the front door was incomplete, and a handrail remained uninstalled. Additionally, some of the cabinets remained uninstalled. However, light fixtures, plumbing, toilets, and most other items were complete. The Court finds JD Powell, Cude and Brown to be credible and accepts these facts.

. . . .

In January of 2012, Cude became aware that there was activity at the house that Cude had not authorized. In response, Cude e-mailed Powell to find out what was going on. Powell replied that he brought a couple interior design specialists into the home. Powell's actions in this regard had not been previously discussed and this was the first Cude had heard about Powell's actions and supposed powers under the contract. On Wednesday, January 25, 2012, Cude e-mailed Powell regarding Powell bringing several interior designers into the house to critique how the house was being finished. Powell claimed he had serious concerns about how the house was being finished.

When asked what Powell found to be such serious missteps by Manor Homes, Powell stated that he did not like the tile Cude's wife had chosen for the master bathroom or the coffee bar Cude had put in the master bathroom. In addition, Powell believed the corners on one of the bathtubs were too sharp, and the tub would not fit because the drain and the wall were incompatible. Furthermore, Powell did not like the black tile on the two fireplaces because he felt it looked cheap. Powell eventually requested to have all of this work re-done. Powell felt that the house was a mess: he stated that the workers left trash "everywhere;" the vanities in the master bathroom were pre-fabricated wood, molded and purchased at The Home Depot or Lowe's; the master bedroom door was not set right; the interior doors were painted and there were paint streaks and paint running down them; the staircase from the driveway into the house at the two garages was allegedly "improper" in terms of measurement; there was a problem with the stairs in the interior of the home; the stairs going to the back of the house had problems as well; the bathtub that was in the garage was still in the box and the other bathtub did not fit; and Manor Homes' placement of the wine cooler in the kitchen was "inappropriate."

Cude and Brown disagreed that the above were done incorrectly as a matter of objective building standards. Additionally, Cude asserted that many of the problems Powell complained about at trial were of his own making after taking over the project and hiring a new general contractor and subcontractors. For example, with respect to the bathtub motors, Cude stated that the tub supports were originally constructed with carve-outs for the tub motors. However, after Powell rebuilt them, the carve-outs were tiled in, and there was no longer access to the tub motor, which resulted in some of the issues Powell identified.

. . . .

Powell did not return the $20,000 Builder Deposit to Manor Homes. Cude paid subcontractors for their work and, after he sold the home, Powell failed to reimburse Cude for these payments to sub-contractors. The . . . amounts Cude paid to the sub-contractors and for which he seeks reimbursement from Powell . . . total $2[0],997.57.

(Footnotes omitted.)

The trial court's conclusions of law include the following, *inter alia*:

[T]he Court makes the following conclusions of law: (1) no Partnership was formed between Ashby and Manor Homes; (2) Ashby and/or Powell committed the first material breach of the PSA and are thereby required to return the Builder Deposit under the PSA in full and pay compensatory damages in accordance with this Order; (3) accounting, appointment of receiver, or collection of proceeds is improper and unnecessary; and (4) this litigation has extinguished the Parties' obligations or liabilities under the PSA.

Manor Homes is entitled to damages for breach of contract because Ashby and Powell materially breached the PSA when they improperly terminated the same after failing to give Manor Homes proper notice and an opportunity to cure.

. . . .

Manor Homes asserts that Ashby and/or Powell were the first to materially breach the contract because Ashby and/or Powell improperly terminated the PSA by removing Manor Homes from the project, refusing to allow Manor Homes to continue performance, and hiring a different builder. Ashby and Powell allege that Manor Homes, Cude, and Brown

were the first to materially breach the contract because Manor Homes, Cude, and Brown allegedly failed to perform various obligations under the contract and eventually abandoned the worksite.

In order to determine which party was the first to materially breach a contract, the Court must first determine what the contract required of the parties, which is a question of law. . . . The PSA explicitly states that any contractor performing work on the home must build the home in compliance with the details contained in Exhibit H to the PSA, which requires rigid, custom specifications for builders who operate in Kings' Chapel and Ashby Communities. Among the items listed in Exhibit H are the following: requirements that fences are accompanied by gates, that the decks use stained wood, that the front door be a metal castle door, that there be key locksets on each exterior door, that granite countertops be used in the powder rooms, that custom cabinets be installed in every room, and that wood spindles meet certain detailed specifications. Ashby and Powell allege that Manor Homes failed to meet each and every one of these aforementioned specific details, and that Manor Homes' failure to do so constituted a material breach of the PSA thereby excusing Ashby and Powell from any of their obligations to perform (*i.e.*, pay subcontractors hired by Manor Homes and/or Cude). However, none of these specifications were cited by Ashby and/or Powell as things to be corrected prior to Ashby and/or Powell's termination of the contract and/or removal of Manor Homes from the job site.

. . . .

The PSA, including all of its corollary agreements, exhibits, and attachments, imposed very rigid requirements on Manor Homes to be followed throughout the entirety of the construction of the home on Lot 239. However, the PSA did not require Manor Homes to submit to every request made by Ashby regarding interior finishes. Additionally, nothing in the PSA permitted Ashby to terminate the PSA for dissatisfaction with the work without first providing Manor Homes notice and a reasonable opportunity to cure the alleged breaches of the PSA. Manor Homes did not by any provision in the PSA waive its right to notice of its breaches and did not agree to permit Ashby to terminate the PSA without cause.

Ashby and Powell were the first to materially breach the PSA because they improperly terminated the PSA by removing Manor Homes from the project on Lot 239 and refusing to pay Manor Homes' subcontractors without first giving Manor Homes notice of its alleged material breaches and a reasonable opportunity to cure.

. . . .

The trial testimony of JD Powell, Cude, and Brown preponderate in favor of a finding that Ashby and/or Powell became upset with Manor Homes' work on the interior of the home on Lot 239. Ashby and/or Powell expressed great anger and frustration with the finishing work Manor Homes had conducted. Powell identified the specific objects of his frustration in his March 1, 2012, email to Manor Homes and/or Cude as follows: (1) "trim work" on the exterior, (2) a fireplace with "metal on the face" that was allegedly not "to code," (3) light fixtures that were allegedly "not to code," (4) a wine cooler, (5) "a house of this nature deserved double ovens," (6) the lack of a 36-inch range, (7) Brown's speed of completion, (8) interior trim and painting, (9) Manor Homes' and/or Cude's scheduling decisions, (10) the vanities in the home, (11) plumbing, and (12) finishing in general. However, the testimony of the Parties at trial provided that this email and the alleged dissatisfaction with the items listed were not provided to Manor Homes, Cude, and/or Brown prior to Ashby and/or Powell's decision to remove them from the project on Lot 239.

The Court did not find Powell to be credible during his testimony as to breach. Although at trial counsel for Ashby and Powell identified several items from Exhibit H that Manor Homes had failed to properly include in the construction of the home, there was no proof offered to establish that Ashby and/or Powell identified these items to Manor Homes, Cude, and/or Brown prior to removing them from the construction project. The Court finds that Ashby and Powell materially breached the PSA because they did not properly give notice and a reasonable opportunity to cure prior to removing Manor Homes from the project.

The trial court next addressed the issue of damages:

The existence and amount of damages are disputed by both Ashby and Powell. Manor Homes alleges that Ashby and Powell are liable for damages arising out of breach of contract because Ashby and Powell improperly removed Manor Homes from its role as builder and refused to reimburse the subcontractors hired by Manor Homes to perform work on Lot 239. Manor Homes also alleges that, but for Ashby and Powell's needless expenditures and demolition work that followed the improper termination, there would have been profits on the sale of the house to which Manor Homes would have been entitled.

. . . .

- 10 -

Ashby and Powell reject any notion that they could be liable for breach of contract because, as they allege, Manor Homes was the first to materially breach by failing to build the home in conformity with the PSA and the details outlined in the exhibits thereto, specifically Exhibit H. However, as stated above, the Court finds that Ashby and Powell were the first to materially breach the PSA. Therefore, Ashby and Powell are required to refund the $20,000 builder deposit, as a specified remedy for the builder under the terms of the PSA, see (Profit Sharing Agreement, § 9, ¶ (b)) and to pay Manor Homes compensatory damages for unpaid subcontractors that Manor Homes and/or Cude paid personally.

Although Section 9, Paragraph (b) of the PSA limits Manor Homes' recovery for breach of the PSA to a refund of the $20,000 deposit, Manor Homes proved by clear and convincing evidence that it suffered damages by not being compensated for its unpaid subcontractors. The Court does not interpret Section 9, Paragraph (b) to be an exculpatory clause enforceable to permit Ashby and/or Powell to escape liability for these compensatory damages it owes to Manor Homes.

The trial court awarded Manor Homes the return of the initial $20,000 deposit it paid when the PSA was signed as well as $20,997.57 to reimburse Manor Homes for the money Mr. Cude paid his subcontractors for the work they performed prior to Manor Homes' termination from the project. The court also awarded Manor Homes its attorney fees in accordance with the PSA.

Mr. Powell and Ashby Communities filed a notice of appeal. They raise the following issues: (1) whether the trial court erred in ruling that Manor Homes was entitled to recover on its breach of contract claim after finding that Manor Homes misrepresented its licensing status and violated the Consumer Protection Act; and (2) whether the trial court erred in finding Manor Homes had standing to recover damages in light of the fact that the company was controlled by Mr. Cude's ex-wife and was dissolved prior to trial.

II. ANALYSIS

A. Standard of Review

We review a trial court's judgment following a non-jury trial de novo on the record, presuming the correctness of the trial court's findings of fact unless the evidence preponderates otherwise. TENN. R. APP. P. 13(d); *Beacon4, LLC v. I & L Invs., LLC*, 514 S.W.3d 153, 168 (Tenn. Ct. App. 2016). Evidence preponderates against a trial court's findings of fact if it supports a different "'finding of fact with greater convincing effect.'" *Beacon4*, 514 S.W.3d at 168-69 (quoting *Wood v. Starko*, 197 S.W.3d 255, 257 (Tenn.

- 11 -

Ct. App. 2006)). Contract interpretation involves a question of law. *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014); *Forrest Constr. Co., LLC v. Laughlin*, 337 S.W.3d 211, 220 (Tenn. Ct. App. 2009) (citing *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999)). We review questions of law de novo, affording the trial court's determinations no presumption of correctness. *Forrest Constr.*, 337 S.W.3d at 220 (citing *Guiliano*, 995 S.W.2d at 95).

B. The Agreement

"A cardinal rule of contractual interpretation is to ascertain and give effect to the intent of the parties." *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009); *see also West*, 459 S.W.3d at 41-42; *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006). The parties' intent is determined by considering "the plain meaning of the words" used in the contract. *Allmand*, 292 S.W.3d at 630; *Allstate Ins. Co.*, 195 S.W.3d at 611. If the words used are clear, unambiguous, and not susceptible to more than one reasonable interpretation, courts are to rely on the literal language used in the contract to determine the parties' intent. *Allmand*, 292 S.W.3d at 630; *Allstate Ins. Co.*, 195 S.W.3d at 611.

When a contract contains different sections, a court is not to read the sections in isolation; rather, it is to read the sections together to determine the meaning of the document as a whole. *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 705 (Tenn. 2008); *S. Trust Ins. Co. v. Phillips*, 474 S.W.3d 660, 668 (Tenn. Ct. App. 2015). "'All provisions of the contract should be construed in harmony with each other to promote consistency and avoid repugnancy among the various contract provisions.'" *Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011) (quoting *Shuttleworth, Williams, Harper, Waring & Derrick, PLLC v. Smith*, No. W2007-02295-COA-R3-CV, 2010 WL 744375, at *3 (Tenn. Ct. App. Mar. 5, 2010)); *see also Forrest Constr.*, 337 S.W.3d at 220; *Wager v. Life Care Ctrs. of Am., Inc.*, No. E2006-01054-COA-R3-CV, 2007 WL 4224723, at *10 (Tenn. Ct. App. Nov. 30, 2007); *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). Additionally, "[w]here an executed agreement refers to the other documents, all of the documents must be construed together as the contract of the parties." *Williams v. Larry Stovesand Lincoln Mercury, Inc.*, No. M2014-00004-COA-R3-CV, 2014 WL 5308634, at *5 (Tenn. Ct. App. Oct. 15, 2014); *see also Real Estate Mgmt. v. Giles*, 293 S.W.2d 596, 599 (Tenn. Ct. App. 1956) (stating where several documents are executed as part of the same agreement, the court reads them together and interprets them with reference to one other).

A contract is ambiguous when the language used may reasonably be understood in more than one way. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002); *Allstate Ins. Co.*, 195 S.W.3d at 611 (citing *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn. 1975)). If the contract contains an ambiguity, the courts look to parol evidence, "including the contracting parties'

- 12 -

conduct and statements regarding the disputed provision, to guide the court in construing and enforcing the contract." *Allstate Ins. Co.*, 195 S.W.3d at 612; *see Allstar Consulting Grp. v. Trinity Church & Christian Ctr.*, No. W2006-00272-COA-R3-CV, 2007 WL 120046, at \*4 (Tenn. Ct. App. Jan. 18, 2007) (explaining parol evidence guides court to discern parties' intent when contract contains ambiguity); *see also Adkins*, 360 S.W.3d at 412 (citing *Smith*, 2010 WL 744375, at \*3). Ambiguous provisions are generally construed against the party that drafted them. *Allstate Ins. Co.*, 195 S.W.3d at 612 (citing *Hanover Ins. Co. v. Haney*, 425 S.W.2d 590, 592 (Tenn. 1968)).

A thorough review of the PSA and the attachments referenced therein reveals that the term "Builder" is used to refer to Manor Homes in some places, and that the term is used to refer to Manor Homes and Mr. Brown in other places. The opening paragraph of the PSA defines Manor Homes as "Builder." Then, a few "WHEREAS" clauses immediately follow the opening paragraph. One of these clauses states:

> **WHEREAS**, the Builder has employed Paul Brown as the general contractor for Builder and they desire to be included in the Developer's "list of approved general contractors" subject to the terms of this Agreement and continued consent of the Developer.

The pronoun "they" seems to refer to both Manor Homes and Mr. Brown.

Another WHEREAS clause states:

> **WHEREAS**, in order to ensure adherence to the highest standards of construction, to enhance the quality of architectural control and design, and to ensure that the homes built within the project conform to the size and square footage requirements as determined by the Developer, in its sole and absolute discretion for each section, the Developer has maintained the right to establish a list of approved general contractors who shall have the right to build residential dwellings within the Project subject to the Developer's right to reserve rights set forth herein and in the "<u>Agreement for Approved Builder Group</u>" which is attached to and made a part hereof (see "Exhibit B")[.]

The Agreement for Approved Builder Group that is referenced in this WHEREAS clause is appended to the PSA as "Exhibit B," and it states:

> **THIS AGREEMENT** (the "Agreement") is made and entered into this ___ day of _____ 2011, by and between Ashby Communities a Tennessee Limited Liability Co. . . . and The Manor Homes LLC, . . . , a Tennessee Limited Liability Corporation. Along with Paul Brown Contractor (hereinafter referred to as "Builder").

- 13 -

Exhibit B thus defines "Builder" to include both Manor Homes and "Paul Brown Contractor."[4]

The second page of the PSA has a section 2 that is titled "Profit Sharing Understanding." Paragraph (k) of this section provides that:

> Builder agrees and understands that Lodis will be used to pay all construction expenses of the house including any payments to Anton or Powell, or Builder. Builder, Anton, & Powell will have ongoing access to the Lodis web site to review progress of construction in comparison to construction budget and payments to Vendors. A copy of the Lodis Contract is attached as Exhibit F.

Exhibit F is titled "Builder/Contractor Construction Funds Accountability Agreement," and the opening sentence of this document states that "THIS AGREEMENT ('Agreement') is made and entered into among Lodis Solutions, Inc. ('Lodis'), and The Manor Homes, LLC [and] Paul Brown (the 'Builder')." Again, the term "Builder" is defined to include both Manor Homes and Mr. Brown.

Finally, the PSA includes a section 6 titled "Party Representations," and paragraph (a) of this section states:

> Builder represents and warrants to Developer that Builder is a duly licensed Tennessee General Contractor in the business of building residences. Tennessee License attached as (Exhibit I). Builder further represents that he/she/it has the current and continued financial capability of fulfilling the Builder's obligations herein. . . .

Although not marked as Exhibit I, a document that immediately follows Exhibit H appears to be a printout from the Tennessee Department of Commerce and Insurance and reflects that Paul Brown had an active contractor license beginning in June 2008, extending to June 2012, and that his monetary limit was $456,000. It is reasonable to assume that this document is the "Exhibit I" that the PSA references in paragraph 6(a), quoted above. The only way to interpret paragraph 6(a) consistently with Exhibit I is to include Mr. Brown within the definition of "Builder" as that term is used in paragraph 6(a).

Ashby Communities and Mr. Powell's contention that Manor Homes misrepresented itself as having a general contractor's license is based on paragraph 6(a),

---

[4]The PSA that Manor Homes attached to its initial complaint does not include the exhibits that the agreement references. However, Mr. Powell identified a collection of documents at trial that were part of the PSA, and the exhibits discussed herein were included in that collection of documents.

quoted above. Because the term "Builder" is defined to include Manor Homes in at least one part of the PSA, whereas it is defined to include both Manor Homes and Mr. Brown in some of the PSA's exhibits, we conclude that the PSA contains an ambiguity. Therefore, we must consider the parol evidence to determine the meaning the parties ascribed to the term "Builder" as that term is used in paragraph 6(a) of the PSA. *See Allstate Ins. Co.*, 195 S.W.3d at 612 (explaining that court considers parol evidence to determine parties' intent when contract contains ambiguity); *Planters Gin Co.*, 78 S.W.3d at 890 (stating that contract is ambiguous when its language can reasonably be understood in more than one way).

Mr. Cude, Mr. Powell, Mr. Brown, and JD all testified at the trial about the circumstances surrounding the PSA and their understanding of who was licensed as a general contractor. Mr. Cude testified that he did not have a general contractor's license, and he understood that someone with a general contractor's license would have to be involved with the construction of the house on Lot 239. Mr. Brown had helped Mr. Cude build his home, and Mr. Cude testified that he asked Mr. Brown if he would be interested in working with him on the project to build the house on Lot 239.

Mr. Brown testified that he attended a meeting with Mr. Cude, Mr. Powell, and JD to discuss the project before any papers were drawn up. Mr. Brown testified that he was licensed as a general contractor and that the parties discussed his monetary limits:

Q: Okay. What was discussed during the meeting?

A: It was all discussed about, you know, aspects of building a house. It was asked what my monetary limit was. And they talked about when they were kids growing up and stuff like that.

Q: Okay. Now, when you say you were asked what your monetary limit was, who asked you?

A: John did.

Q: All right. And did he discuss that with you beyond just asking you?

A: No - - yes. Yes.

Q: Okay. So he asked you what your monetary limit was. Did you tell him?

A: Yeah.

Q: Okay. What was his response?

A:  He told me that I'd have to have it raised in order to build the house that we were planning on building.

Q:  Okay.  And did he suggest a range for you to raise it to?

. . . .

A:  Yeah.  Half a million.

Mr. Brown further testified that his role in the project was to be the general contractor and the superintendent.

Mr. Cude testified that he met several times with Mr. Powell to discuss the construction project; some meetings included just Mr. Cude and Mr. Powell, and some meetings included Mr. Powell, JD, and Mr. Brown.  Mr. Cude testified that the four of them met as a group "to discuss the logistics of moving this forward where Paul was going to be represented as the contractor on the project for me as the builder, and that's where the monetary limits were discussed."  Mr. Cude's testimony included the following:

Q:  Okay.  And what was discussed at that meeting?

A:  In general, the - - because that meeting was - - that meeting was in the summer of 2010, and so we were getting closer. . . .  So there were specific conversations about the house, the value of the house. . . .  So the conversation and the question about the monetary limit came up because we needed to know what the monetary limit was going to need to be in order for Paul's license to be able to manage, you know, the build of the house.

Q:  Okay.  So were there discussions about Mr. Brown's monetary limits?

A:  There were.  That's how we decided - - John made a comment to the effect that it needed to approach a half a million based on the level of the house that we were looking to build.

Q:  Okay.  And was Mr. Powell made aware of what Paul Brown's monetary limits were at the time of the meeting?

A:  He was.  There were conversations about Mr. Brown's monetary limit, and the conversation around that it would need to be raised.

- 16 -

Q: Okay. Did you and Mr. Brown then set about trying to get his limits raised?

A: We did.

In response to a question about whether it was ever represented that he was going to be the general contractor for the project, Mr. Cude replied: "It never was."

JD was asked whether his brother (John Powell) "understood that Paul [Brown] was the general contractor for this project." JD responded: "He always understood that." JD testified further as follows:

Q: Did [John Powell] ever ask Mike Cude about his contractor's license or his monetary limits?

A: No.

Q: Okay. He directly asked Paul Brown?

A: Yes.

Q: Did he even ask Mike Cude if he had a contractor's license?

A: If Mike had one or Paul had one?

Q: If Mike had one.

A: I think it's - - I recall that Mike has always told me he never had a contractor's license.

Q: Okay. And did he express at any of these meetings to your brother, John Powell - -

A: It was clearly understood from day one that Paul was the contractor, he had the license. And at that meeting, there's another thing I remember. They were going to have to increase the limits on his contractor's license . . . .

Mr. Powell testified that he "understood Paul Brown was going to be employed by Manor Homes or as the general contractor" on the project. He did not testify that he believed Mr. Cude had a general contractor's license.

- 17 -

As revealed by the testimony at trial, no one involved in the construction project believed Mr. Cude had a general contractor's license, and everyone understood that Mr. Brown had a general contractor's license. As Mr. Cude, Mr. Brown, and JD all testified, Mr. Powell participated in at least one meeting where Mr. Brown's monetary limits were discussed, and Mr. Powell informed Mr. Brown that he would have to increase the limits on his contractor's license. The trial court found Mr. Cude, Mr. Brown, and JD were credible, and the defendants point to nothing in the record to suggest that any of these witnesses' testimony should be questioned.

Construing the different parts of the PSA in harmony with one another, taking into account the testimony of the witnesses regarding the project participants' understanding that Mr. Brown was the only one with a general contractor's license, and construing the PSA against its drafter, Mr. Powell, we conclude that the term "Builder" as used in paragraph 6(a) of the PSA refers to both Manor Homes and Mr. Brown. A result of this interpretation of the PSA is that Manor Homes did not misrepresent its licensing status, as Ashby Communities and Mr. Powell contend.[5]

Ashby Communities and Mr. Powell argue that Manor Homes breached the PSA because it failed to complete the construction of the home on Lot 239 and obtain a certificate of occupancy (1) within the time frame set forth in the agreement, (2) within the stated budget, and (3) according to the guidelines set forth in Exhibit H of the PSA. Mr. Cude and Mr. Brown testified that Mr. Powell caused some early delays when he raised concerns about the topsoil in the crawlspace and the lumber supplier and that they believed they were going to complete the house in a timely fashion after accounting for these delays. The trial court believed Mr. Cude's and Mr. Brown's testimony with regard to this issue and found the following facts:

> Powell and/or Ashby caused several delays that affected Manor Homes' timely construction of the home on Lot 239, including: changing the lumber package from Huskey to Builder's First Source, which delayed the project about six weeks; pinning the lot, which delayed work about two weeks; and Powell's stop work order relating to the crawl space, resulting in yet another delay of an additional two weeks. In all, Ashby caused delays amounting to a period of about ten weeks.

The record shows that Manor Homes began construction in May 2011 and was separated from the project in January 2012. Subtracting ten weeks from this eight- to nine-month period, Manor Homes had another month or so to finish the project within the prescribed

---

[5]Ashby Communities and Mr. Powell complain that Mr. Brown's general contractor's license did not have a sufficiently high monetary limit when the PSA was signed. However, Exhibit I to the PSA reveals that Mr. Brown's monetary limit was $456,000, which exceeds the $415,000 budget to which the parties agreed.

seven-and-a-half month time frame set forth in the PSA when it was separated from the project.

Mr. Cude and Mr. Brown also testified that they were about $8,000 under the budget limit when Mr. Powell separated Manor Homes from the project. The trial court found Mr. Cude and Mr. Brown's testimony regarding the budget credible, and Ashby Communities and Mr. Powell have failed to show the evidence preponderates otherwise.

With respect to the guidelines set forth in Exhibit H of the PSA, Mr. Cude admitted at trial that Manor Homes was not in compliance with some of these guidelines. However, the trial court found, and Ashby Communities and Mr. Powell do not dispute, that Mr. Powell never mentioned any concerns he had with the work Manor Homes was doing on the house (after the initial disagreements at the beginning of the project) until shortly before Mr. Powell separated Manor Homes from the project. Mr. Cude wanted to know what Mr. Powell's concerns were so he could address them and correct anything that might have been wrong, but Mr. Powell did not respond to Mr. Cude's phone calls or e-mails. As stated above, the trial court did not find Mr. Powell's testimony as to the breach of the PSA to be credible, and the court found that Ashby Communities and Mr. Powell committed the first material breach of the PSA by removing Manor Homes from the project and failing to give it a chance to cure the problems Mr. Powell identified before removing Manor Homes from the construction project.

The law in Tennessee is that "a party alleging defects in the performance of a contract is required to give notice and a reasonable opportunity to cure the defects." *Forrest Constr.*, 337 S.W.3d at 229 (citing *Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995)). The reason for this requirement is to encourage contracting parties to settle their disputes and avoid litigation by allowing the defaulting party the chance to repair defective work, reduce damages, and avoid additional problems. *Id.* (citing *Custom Built Homes by Ed Harris v. McNamara*, No. M2004-02703-COA-R3-CV, 2006 WL 3613583, at *5 (Tenn. Ct. App. Dec. 11, 2006)). In addition, the party that commits the first breach of a contract is precluded from recovering damages based on the other party's later breach of the same contract. *Id.* at 226 (citing *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997), and *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)); *see also Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009). Because Ashby Communities and Mr. Powell did not give Manor Homes notice and an opportunity to cure any defects in the house prior to removing it from the project, we affirm the trial court's conclusion that Ashby Communities and Mr. Powell were the first to breach the PSA and are, therefore, not entitled to recover damages as a result of Manor Homes' failure to comply with the specifications set out in Exhibit H to the PSA.

C. Tennessee Consumer Protection Act and Intentional Misrepresentation

The Tennessee Consumer Protection Act ("TCPA") includes a list of unfair or deceptive acts or practices affecting the conduct of any trade or commerce that are unlawful and constitute violations of the statute. Tenn. Code Ann. § 47-18-104(b). Section 47-18-104(b)(35) identifies "[r]epresenting that a person is a licensed contractor when such person has not been licensed" as unfair or deceptive. The trial court found that (1) Manor Homes misrepresented that it was a licensed general contractor and that (2) Manor Homes and/or Mr. Brown misrepresented that they had the financial capability to fulfill all of their obligations under the PSA. The court found that one or both of these misrepresentations constituted a technical violation of the TCPA but that "this technical violation of the Act did not proximately cause any damages to Ashby and Powell" and denied relief to the defendants for these claims. Ashby Communities and Mr. Powell assert that the trial court erred in so ruling.

We begin by recognizing that we have already determined that the term "Builder," as that term is used in paragraph 6(a) of the PSA, includes both Manor Homes and Mr. Brown. In light of this determination, we find that the evidence preponderates against the trial court's factual finding that Manor Homes misrepresented itself as a licensed general contractor in paragraph 6(a) of the PSA. With regard to whether Mr. Brown's general contractor's license had a sufficiently high monetary limit, the record is unclear about when Mr. Brown's monetary limits were raised to $456,000, as Exhibit I reflects. The trial court found that Mr. Brown's monetary limits were not "sufficiently high" when the PSA was signed. However, Mr. Powell drafted the PSA, and the record shows that Mr. Powell knew before the PSA was signed that Mr. Brown was going to have to have the monetary limits of his general contractor's license raised. Because of this knowledge, Ashby Communities and Mr. Powell cannot recover for intentional misrepresentation as a matter of law. *See Hodge v. Craig*, 382 S.W.3d 325, 343 (Tenn. 2012) (party asserting misrepresentation must prove he did not know representation was false when made and that he was justified in relying on truth of representation).

Moreover, there is no evidence that before the TBLC raised Mr. Brown's monetary limit, the lower limit of Mr. Brown's license resulted in any delay in the project or caused Ashby Communities or Mr. Powell to suffer any damages or harm. In TCPA cases, the party alleging a misrepresentation must show that the misrepresentation proximately caused an injury or loss. *Johnson v. Dattilo*, No. M2010-01967-COA-R3-CV, 2011 WL 2739643, at *7 (Tenn. Ct. App. July 14, 2011) (citing *White v. Early*, 211 S.W.3d 723, 741 (Tenn. Ct. App. 2006)); *Steamfitters Local Union No. 614 Health & Welfare Fund v. Philip Morris, Inc.*, No. W1999-01061-COA-R9-CV, 2000 WL 1390171, at *7 (Tenn. Ct. App. Sept. 26, 2000); s*ee also Hodge*, 382 S.W.3d at 343 (stating that party asserting misrepresentation must show he sustained damages resulting from misrepresentation); *Harrogate Corp. v. Sys. Sales Corp.*, 915 S.W.2d 812, 817 (Tenn. Ct. App. 1995) (same). Ashby Communities and Mr. Powell have failed to show

any alleged misrepresentation by Manor Homes or Mr. Brown proximately caused it to suffer harm. As a result, we affirm the trial court's conclusion that neither Manor Homes nor Mr. Cude is liable for any misrepresentation pursuant to the TCPA or under common law. [6]

Ashby Communities and Mr. Powell also argue that Manor Homes should be precluded from recovering on its claims because it had "unclean hands." However, the defendants base this claim on the assertion that Manor Homes represented itself as a licensed general contractor, an allegation which we have found to be inaccurate. Thus, there is no need to consider further Ashby Communities and Mr. Powell's argument that Manor Homes should be barred from recovering on its claims due to unclean hands.

### D. Standing of Manor Homes to Pursue Recovery

Ashby Communities and Mr. Powell's final argument on appeal is that Manor Homes lacked standing to pursue a recovery of civil damages because the entity was dissolved two years prior to trial; Mr. Cude, who pursued this case on behalf of Manor Homes, was not an officer or owner of the company; and by the time of trial, Mr. Cude was no longer married to Tracy Lytle, who was the sole member of the limited liability company.

As Manor Homes points out, Ashby Communities and Mr. Powell did not raise the issue of Manor Homes' standing at trial until their closing argument. An argument based on standing is properly raised:

> by a specific denial or defense (but not an affirmative defense under Rule 8.03) in the answer or responsive pleading, or by a motion to dismiss under Rule 12.02(6) or in proper cases by a motion for judgment on the pleadings under Rule 12.03, or a motion to strike under Rule 12.06.

*Knierim v. Leatherwood*, 542 S.W.2d 806, 808 (Tenn. 1976). By waiting until closing argument to raise this issue, the defendants did not give Manor Homes an opportunity to present evidence to counter this assertion. A party that fails to raise the issue of standing at trial is precluded from raising the issue on appeal. *In re Estate of Smallman*, 398 S.W.3d 134, 148 (Tenn. 2013) (citing *Correll v. E.I. DuPont de Nemours & Co.*, 207 S.W.3d 751, 757 (Tenn. 2006)); *State ex rel. Wolfenbarger v. Moore*, No. E2008-02545-COA-R3-CV, 2010 WL 520995, at *3 (Tenn. Ct. App. Feb. 12, 2010). We find Ashby Communities and Mr. Powell effectively failed to raise the issue of standing at trial

---

[6]Because we find Ashby Communities and Mr. Powell cannot recover for intentional misrepresentation, we need not address Manor Homes' and Mr. Cude's assertion that the TCPA does not apply to this transaction for the reason that neither Mr. Powell nor Ashby Communities are "consumers." *See Ganzevoort v. Russell*, 949 S.W.2d 293, 297 (Tenn. 1997) (explaining that TCPA was enacted to protect consumers and to promote fair consumer practices).

because they waited until closing arguments to raise it. The trial court did not address this issue in its Memorandum and Order, and the defendants did not file a motion following the trial asking for a ruling on this issue. Accordingly, we conclude that Ashby Communities and Mr. Powell have waived the issue of standing on appeal.[7]

## III. CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellants, John Powell and Ashby Communities, LLC, for which execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE

---

[7]The record shows that Manor Homes was not dissolved until 2014, which was after the litigation was commenced but before the defendants filed their amended counterclaim. The defendants are unable to argue, therefore, that they were unable to raise the issue of standing when they filed their amended counterclaim.