FILED
06/29/2020
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
June 9, 2020 Session

## GREG CALFEE BUILDERS LLC v. NEILL MAGEE AND DIANE MAGEE

Appeal from the Chancery Court for Bradley County
No. 2016-CV-068      Jerri S. Bryant, Chancellor

No. E2019-00905-COA-R3-CV

This appeal concerns an alleged breach of contract. Greg Calfee ("Mr. Calfee"), on behalf of Greg Calfee Builders LLC ("GCB"), and Neill MaGee ("Mr. MaGee") signed an agreement ("the Contract") whereby GCB would custom-build a home for Mr. MaGee and his wife, Diane MaGee ("the MaGees," collectively). Mr. MaGee, citing a number of construction defects, later terminated GCB from the job and told Mr. Calfee that GCB could not come back despite GCB's willingness and offer to correct the defects. GCB sued the MaGees in the Chancery Court for Bradley County ("the Trial Court") seeking to recover money it alleged was still owed to it. Mr. MaGee filed a counterclaim. GCB filed a motion for summary judgment, which the Trial Court granted. The MaGees appeal. We find and hold, *inter alia*, that under both Tennessee caselaw and the Contract, Mr. MaGee was required to give GCB notice and a reasonable opportunity to cure the defects, yet he failed to do so. GCB is entitled to judgment as a matter of law. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

W. Lewis Jenkins, Jr., Dyersburg, Tennessee, for the appellants, Neill MaGee and Diane MaGee.

Stuart F. James, Chattanooga, Tennessee, and, Michael E. Jenne, Cleveland, Tennessee, for the appellee, Greg Calfee Builders LLC.

# OPINION

## Background

In 2014, Mr. Calfee of GCB and Mr. MaGee signed the Contract. Under the Contract, GCB was to build a home for the MaGees in Bradley County, Tennessee for $694,175. The home was to be custom-built with a number of highly particularized features such as floors made from reclaimed cypress wood. The Contract provided for an initial down payment by the MaGees to be followed by "progress payments" as GCB completed work. The Contract also provided for final payment prior to occupancy after final walkthrough and corrections. As pertinent to the issues on appeal, the Contract provided these additional terms:

> 10. Contractor Warranties: . . . . (d) . . . If a defect appears which Owner believes is covered by the Contractor's duty of quality workmanship, Owner shall notify Contractor in writing describing such defect, also stating the times during the day Owner will be available at the improvements so Contractor can schedule service calls appropriately. Upon receipt of Owner's written report of a defect, if the defective item is covered by the Contractor's duty and quality workmanship, Contractor shall repair or replace it at no charge to Owner within thirty (3)[1] days (unless due to delays caused by weather conditions, labor problems or material shortages). Notwithstanding the foregoing Contractor and Owner expressly waive the statutory limitations on actions for defective improvements of real estate, as provided by TCA 28-3-201 et. seq., and in lieu thereof covenant and agree that all actions recoverable under the statutory provision shall be brought within one (1) year after substantial completion of the improvements.

> ***

> 19. Termination by Owner: If the Contractor materially defaults or materially neglects to carry out the work in accordance with the contract documents, Owner may, after five (5) days written notice to the Contractor and without prejudice to any other remedy they may have, make good such deficiencies and may deduct the cost thereof from the payment then or thereafter due the Contractor, or, at their option, may terminate the contract and take possession of the site and of all materials, and may finish the work by whatever method they may deem expedient, and if the unpaid balance of the contract price exceeds the expense of finishing the work, such excess

---

[1] This discrepancy between "thirty" and "(3)" is contained within the Contract.

shall be paid to the Contractor, but if such expense exceeds such unpaid balance, the Contractor shall pay the difference to the Owner.

20. Litigation Fees: The parties agree that in the event either party breaches this agreement, the non-defaulting party as additional damages shall be entitled to the cost of litigation, including reasonable attorney's fees to enforce this agreement.

Work began on the home, and time passed. In late July 2015, Mr. MaGee sent Mr. Calfee a "punch list" via email of items he felt needed correcting. On July 31, 2015, Mr. Calfee met Mr. MaGee at the home and went through the punch list items room by room. Mr. Calfee told Mr. MaGee that he would correct these problems. Mr. MaGee agreed that Mr. Calfee could return on August 3, 2015 to begin making the corrections.

However, when Mr. Calfee returned on August 3, 2015, Mr. MaGee told him "I don't want you back into my home. I don't want your subcontractors back in the home." Mr. Calfee left. Later that day, Mr. Calfee sent Mr. MaGee an email stating that he still wanted to make the corrections. Mr. MaGee responded with an email confirming that "Neill and Diane do not want Greg Calfee or his subcontractors to work on the punch list items in the home." On August 24, 2015, counsel for Mr. Calfee and GCB sent a letter to the MaGees stating that Mr. Calfee stood ready, willing and able to complete the items on the punch list at their earliest convenience.

Meanwhile, Robert Thompson, an attorney and mutual friend of the parties, tried to help resolve the dispute. Mr. Thompson wrote a letter to both parties dated August 10, 2015 containing these key points:

--the balance owed to GCB was $163,770.22;
--the MaGees would pay $138,351.71 in exchange for GCB executing a Contractor's affidavit reflecting that all bills had been paid and there were no materialmen's liens;
--the only issue that remained was the floor repair; and,
--the MaGees would initially retain $25,418.51 for the floor repairs.

A follow-up letter from Mr. Thompson dated August 11, 2015 reflected that the matter had not been fully settled. Mr. Thompson updated where things stood:

--the parties were at an impasse regarding the remaining balance of $25,418.51;

-3-

--per Mr. MaGee's instruction, Robert Thompson had delivered the $138,351.71 check to GCB and was now providing the executed Contractor's Affidavit to the MaGees; and,
--the outstanding balance of $25,418.51 remained in dispute.

In the August 11 letter, Mr. Thompson wrote also: "Both of you have reserved all of your rights to pursue whatever action you deem appropriate with respect to this dispute. I regret that I was unable to assist you in reaching a complete resolution. Therefore, neither of you owe me anything for my services."

Some three months after Mr. Calfee and GCB were told unequivocally that they were not allowed to come back, the MaGees finally relented. In a letter to GCB's counsel dated November 23, 2015, counsel for the MaGees wrote:

I have had lengthy conversations with Mr. & Mrs. MaGee concerning the numerous problems with their home. Based on those conversations they are willing to have Mr. Calfee and his subcontractors return and perform corrective work to bring the entire house into compliance with the plans, specifications and contract documents. . . .

However, GCB did not return. Instead, in March 2016, GCB sued the MaGees in the Trial Court "for enforcement of lien, breach of Contract and/or quantum meruit." The MaGees filed an answer. Mr. MaGee, for his part, filed a counterclaim seeking an accounting of funds paid under the Contract. Mr. MaGee later filed an amended counterclaim seeking no less than $600,000 in damages for the "defective and negligent work performed by Contractor and its subcontractors."

In May 2018, GCB filed a motion for summary judgment asserting that Mr. MaGee had denied it an opportunity to cure the defects. GCB sought $25,418.51 it alleged was still owed to it. As part of their response, the MaGees filed the affidavit of custom-building contractor and construction expert Charles Alexander, who detailed the alleged deficiencies in GCB's work. The following is but a portion of Mr. Alexander's lengthy affidavit:

4. I observed that the finishes in the MaGee home did not meet the standards applicable to a custom house of this type. Any experienced custom home builder knows that the finishes are a critical part of the construction to meet the owner's expectations. There were extreme variations in the quality of the workmanship in the finishes at the MaGee home. These variations reflect a lack of supervision by the contractor and its subcontractors and/or a lack of knowledge of what was required by the

-4-

particular trades. The variations in the quality of finishes showed some tradesmen had the skill to do the work correctly, but simply did not apply that skill in a consistent manner. There were also finishes that indicated particular trades lacked adequate training and skill or failed to take sufficient time and apply sufficient effort to do the work correctly.

\*\*\*

8. I understand from my investigation that the general contractor understood the owners were going to use reclaimed cypress wood for the flooring throughout the house. I further understand that the supplier of the reclaimed cypress wood had telephone conversations with the general contractor in which he reviewed the culling and selecting procedures that would be necessary. Finally, I understand that as the work progressed, the supplier made a trip to the MaGee home to review these procedures for culling and selecting boards with the general contractor.

9. Based on my observations, the resulting floors at the MaGee home show that these instructions were not followed by the general contractor. Boards were used that had gaps and openings at joints and places in the boards that should have been cut out prior to installation, which displays a lack of attention to the culling and selection process. This is what results when the installer is inexperienced or in a rush to perform without taking the time and care demanded by the nature of the materials he is working with. It also shows a lack of knowledge, experience and/or supervision by the contractor to be sure the proper care and precautions were taken.

10. Because the cypress wood flooring was installed incorrectly, the subcontractor hired to finish the floors had a much more challenging job. The incorrect installation made it far more difficult for the finisher. I understand that in spite of this, the subcontractor assured the owner that with extra work, and extra compensation for that work, the subcontractor could produce the floors expected by the owner.

11. I understand that the owner raised issues with the general contractor and the flooring subcontractor about the condition of the floor before the finished coat was applied. I understand that the owner was assured these conditions would be corrected in a satisfactory manner. However, my personal observation showed areas where the floors were damaged, apparently by efforts to remove and substitute some of the boards and where gaps, joint openings remain. See, Ex.

12. The result was a floor surface that required remedial action. The only way to produce a finished floor that meets the owner's intention and expectation is to move out of the house, remove the interior trim, such as

the baseboards, remove all built-in cabinetry and all appliances, (remove the existing floor system and replace it).

13. I understand that the floor finisher tried to remove paint and plaster from the unfinished floors and charged extra for it. I understand the floor boards arrived before the plastering work was begun and the contractor stored the boards in the dining room thereby subjecting the boards to moisture gain and swelling. After the flooring was installed, plaster repair and painting was done which allowed plaster and paint to penetrate the flooring before it was sealed.

14. I understand that records have been furnished that show the flooring finish subcontractor charged extra in a failed attempt to remove plaster and paint that had fallen on the sanded, reclaimed cypress floors. This is a wholly improper sequence in the work and not only exposed the boards to damage, but would create open gaps as the swollen flooring, which had been incorrectly stored at the job site by the contractor, became exposed to conditioned air as the building was closed in. This indicates a failure to properly schedule the work and resulted in damage to the reclaimed cypress. The result is the finisher improperly sealed in the paint/plaster splatters in the finished floor.

***

24. The flaws in the floor installation, trim, staircase, ceramic tile, paint and plaster are such that they should have been seen and corrected before the owner ever did a punch list. Based on my investigation and overall evaluation of the project, and my experience as a general contractor who constructs custom homes, it is understandable that an owner would refuse to let the same contractor and subcontractors attempt to correct the defective work when the project is supposed to be substantially complete.

In September 2018, the Trial Court entered an order denying GCB's motion for summary judgment. The Trial Court stated, in part:

[T]he Court finds that first, identifying the party who committed the first material breach is a question of fact and that there are disputed issues of fact in the record, and second, the reasonableness of Mr. MaGee's conduct on August 3, 2015 and thereafter in refusing Plaintiff access to the property to make repairs and/or correct defects is also a question of fact and that there are disputed issues of fact in the record, the Motion is hereby denied.

GCB filed a motion to alter or amend. In October 2018, the Trial Court entered another order, this time granting GCB's motion for summary judgment. The Trial Court stated:

> This cause came to be heard on the 26[th] day of September 2018 upon Plaintiff's motion to alter or amend and notice of hearing. The Court treats this motion to alter or amend its previous denial of the motion for summary judgment as a re-argument of the motion for summary judgment based on the case law that was released by the Court of Appeals on August 10, 2018, after the hearing on the original motion for summary judgment.
>
> Plaintiff is heavily relying on the case of *Manor Homes LLC v. Ashby Communities LLC*, 218 WL 3814981 (Tenn. Ct. App. Aug. 10, 2018). Plaintiff argues that the *Manor Homes* case is on point with this case and this Court's previous ruling that "identifying the party who committed the first material breach as a question of fact" is an incorrect statement of this Court's initial duty. According to *Manor Homes*, this Court is to first determine what the contract required of the parties (*Manor* at p. 5).
>
> In this case, it is clear that in 2014 the Plaintiff agreed to construct a residence for Defendant in Bradley County, Tennessee. A Construction Contract was entered into between the parties. The construction contract contained a notice and opportunity to cure provision which provided in relevant part:
>
>> "if a defect appears, which owner believes is covered by contractor's duty of quality workmanship, owner shall notify contractor, in writing, describing such defect, also stating the times during the day Owner will be available at the improvements so contractor can schedule service calls appropriately. Upon receipt of Owner's written report of a defect, if the defective item is covered by the contractor's duty and quality of workmanship, contractor shall repair or replace it, at no charge to Owner, within three (3) days (unless due to delays caused by weather conditions, labor problems or material shortages…)"
>
> The Construction Contract also provided for "final payment prior to occupancy after final walk through and corrections". On July 28, 2015 Defendant submitted a "punch list" of items he felt needed correction via email to Plaintiff. On July 31, 2015 Defendant and Plaintiff met at the residence/home and went through the punch list items, room by room. At

the end of that process, Defendant agreed for Plaintiff to come back to the residence on August 3, 2015 to make repairs. Plaintiff returned to the residence on August 3, 2015 and was told by Defendant "I do not want you back into my home. I do not want your sub-contractors back in the home". In response, Plaintiff left the premises and sent the Defendant an email stating he wanted to perform the punch list corrections. On August 24, 2015 attorney for Plaintiff wrote Defendant stating that "Mr. Calfee stands ready, willing, and able to complete the items on your punch list at your earliest convenience".

The contract between Plaintiff and Defendant is clear. Defendant had a contractual obligation to allow Plaintiff the opportunity to cure. The right to cure alleged defects is clear in the contract. (See *Statement of Material Facts* #6) It is admitted, by the Defendant, that on July 27, 2015 Defendant submitted a "punch list" of items he felt needed corrections via email to the Plaintiff. It is further admitted that on July 31, 2015, Plaintiff met with Defendant at the residence/home and went through the "punch list" items room by room. It is further admitted that on July 31, 2015 Plaintiff stated to Defendant that Plaintiff would fix the problems noted and Defendant would be happy when Plaintiff was finished. It is further admitted Defendant agreed for Plaintiff to come back to the residence on August 3, 2015 to make those repairs. It is further admitted that when Plaintiff returned to the residence on August 3, 2015, Defendant told him "I don't want you back in my home. I don't want your sub-contractors back in the home." It is further admitted Plaintiff left the premises and sent an email to Defendant on August 3, 2015 stating he wanted to perform the punch list of corrections. It is further admitted that Defendant answered the email and confirmed he did not want Plaintiff to make those corrections. It is further admitted that on August 24, 2015 attorney M. Jenne wrote a letter on behalf of Plaintiff to Defendant stating "Mr. Calfee stands ready, willing and able to complete the items on your punch list at your earliest convenience". It is further admitted Defendant never communicated a response to that letter that Plaintiff would be allowed to complete the punch list.

The Court finds the contract as well as case law requires the owner to give the opportunity to cure any defects in workmanship. By failing to do so, Defendant was in material breach of the contract.

It is therefore, ORDERED, ADJUDGED and DECREED that the Motion for Summary Judgment is GRANTED on both the Plaintiff's contract claim and dismissing Defendant's counter-claim.

GCB filed an application for attorney's fees, and the MaGees filed a motion to alter or amend. In January 2019, the Trial Court entered an order awarding GCB $62,844.96 in attorney's fees to be assessed against Mr. MaGee. In May 2019, the Trial Court entered its final order, wherein it ruled on the MaGees' motion to alter or amend. The Trial Court stated:

> This cause came to be heard on the 28th day of February, 2019 upon the Defendants' *Motion to Alter or Amend* the previous order entered in this matter. Defendant asked this Court to review its prior ruling on several bases. After review of each of those, the Court hereby grants the motion in part and denies the motion in part.
>
> Defendants asked this Court to clarify its previous order that Diane Magee was not a party to any contract in this case. On June 20, 2018 this Court previously reserved ruling on the motion to dismiss the breach of contract claim against Diane Magee. After review of the previous order in this matter, it appears there is no dispute that Ms. Magee was not a party to any contract with the Plaintiff in this case and therefore any breach of contract claim against her is dismissed.
>
> Next, Defendant has asked this Court to reconsider the October 2018 order granting summary judgment and dismissing the Counter-complaint. Defendant takes the position there were two parts to the counter-claim: (1) a claim for damages for defective work; and (2) a claim for accounting under the contract. It is the Defendant's position that the Motion for Summary Judgment did not address the accounting part of the claim.
>
> After review of the motion, this Court agrees in part. The Court did not address the accounting issue specifically. However, prior to suit being filed, the parties agreed to a partial settlement of the issues between them. This settlement obviated the need for an accounting.
>
> The only issue left between the parties was embodied in the agreement. Defendant admitted the amount owed per Exhibit 8 to Calfee Statement of Facts. The only issue remaining was the floor repair which Defendant refused to allow Plaintiff the opportunity to cure per the contract.
>
> Therefore, the motion to alter is denied. The motion to amend is granted to specifically reflect that the complaint for an accounting is dismissed.

The MaGees timely appealed.[2]

---

[2] In his reply brief on appeal, Mr. MaGee states: "Greg Calfee Builders, LLC does not appear to have appealed the determination by the trial court that Diane MaGee should be dismissed as a defendant, since she had never executed the contract with Greg Calfee Builders, LLC . . . Consequently, this reply brief is

**Discussion**

The MaGees raise five issues on appeal. We restate and consolidate these five into the following two dispositive issues: 1) whether the Trial Court erred in granting GCB's motion for summary judgment; and, 2) whether the Trial Court erred in declining to find that Mr. MaGee is entitled to an accounting of funds paid to GCB. Although not stated exactly as such, GCB raises the following separate issue: whether GCB is entitled, under the Contract, to an award of attorney's fees incurred since the Trial Court entered its January 2019 order on attorney's fees.

As our Supreme Court has instructed regarding the standard of review on motions for summary judgment:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

\*\*\*

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the

---

submitted for Neill MaGee." Indeed, GCB has not appealed Ms. MaGee's dismissal, nor has it made any argument regarding Ms. MaGee. We leave the Trial Court's dismissal of Ms. MaGee undisturbed.

moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC,* 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

Regarding contract interpretation, our Supreme Court has stated:

When we interpret a contract, our role is to ascertain the intention of the parties. The intention of the parties is based on the ordinary meaning of the language contained within the four corners of the contract. The interpretation of a contract is a matter of law, which we review de novo with no presumption of correctness.

*84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) (citations omitted).

-11-

We first address whether the Trial Court erred in granting GCB's motion for summary judgment. The MaGees, arguing that the Trial Court erred, assert the following: (1) there is no duty to provide notice and opportunity to cure when the contractor has superior knowledge of deficiencies, is aware of these deficiencies in his or her own work, and/or continuously fails to meet the contract specifications during construction; (2) under the Contract, Mr. MaGee was permitted to terminate, without notice or opportunity to cure, for material neglect or a material breach; (3) even if Mr. MaGee was required to provide GCB notice and opportunity to cure, he did so; and, (4) genuine issues of material fact as to which party breached the Contract first preclude summary judgment. The MaGees argue further that paragraph 19 of the Contract concerning termination is operative here rather than paragraph 10 concerning warranties, including the language about the opportunity to cure.

In granting summary judgment to GCB, the Trial Court relied on *Manor Homes, LLC v. Ashby Communities, LLC*, No. M2017-01369-COA-R3-CV, 2018 WL 3814981 (Tenn. Ct. App. Aug. 10, 2018), *no appl. perm. appeal filed*. The parties dispute the significance and application of *Manor Homes* to this case. In *Manor Homes*, we discussed the requirement to give notice and a reasonable opportunity to cure construction defects as follows:

> With respect to the guidelines set forth in Exhibit H of the PSA [the contract], Mr. Cude admitted at trial that Manor Homes [the builder] was not in compliance with some of these guidelines. However, the trial court found, and Ashby Communities and Mr. Powell do not dispute, that Mr. Powell never mentioned any concerns he had with the work Manor Homes was doing on the house (after the initial disagreements at the beginning of the project) until shortly before Mr. Powell separated Manor Homes from the project. Mr. Cude wanted to know what Mr. Powell's concerns were so he could address them and correct anything that might have been wrong, but Mr. Powell did not respond to Mr. Cude's phone calls or e-mails. As stated above, the trial court did not find Mr. Powell's testimony as to the breach of the PSA to be credible, and the court found that Ashby Communities and Mr. Powell committed the first material breach of the PSA by removing Manor Homes from the project and failing to give it a chance to cure the problems Mr. Powell identified before removing Manor Homes from the construction project.
>
> The law in Tennessee is that "a party alleging defects in the performance of a contract is required to give notice and a reasonable opportunity to cure the defects." *Forrest Constr.*, 337 S.W.3d at 229 (citing *Carter v. Krueger*, 916 S.W.2d 932, 935 (Tenn. Ct. App. 1995)).

The reason for this requirement is to encourage contracting parties to settle their disputes and avoid litigation by allowing the defaulting party the chance to repair defective work, reduce damages, and avoid additional problems. *Id.* (citing *Custom Built Homes by Ed Harris v. McNamara*, No. M2004-02703-COA-R3-CV, 2006 WL 3613583, at *5 (Tenn. Ct. App. Dec. 11, 2006)). In addition, the party that commits the first breach of a contract is precluded from recovering damages based on the other party's later breach of the same contract. *Id.* at 226 (citing *United Brake Sys., Inc. v. Am. Envtl. Prot., Inc.*, 963 S.W.2d 749, 756 (Tenn. Ct. App. 1997), and *McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)); *see also Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009). Because Ashby Communities and Mr. Powell did not give Manor Homes notice and an opportunity to cure any defects in the house prior to removing it from the project, we affirm the trial court's conclusion that Ashby Communities and Mr. Powell were the first to breach the PSA and are, therefore, not entitled to recover damages as a result of Manor Homes' failure to comply with the specifications set out in Exhibit H to the PSA.

*Manor Homes*, 2018 WL 3814981, at *12.

Thus, *Manor Homes* bolsters GCB's position that it was entitled to notice and a reasonable opportunity to cure defects. The MaGees, however, point out a number of cases standing for the proposition that notice and opportunity to cure may be excused in some circumstances. In *Forrest Const. Co., LLC v. Laughlin*, this Court discussed as follows:

We believe that the cases of *Custom Built*, *Eastbourne*, *Salley*, and *Vaccaro* support the finding that Forrest Construction's material breach of the contract by failing to adhere to the contract's terms, and the substantial number of defects in the construction excused the Laughlins from the requirement to give notice and an opportunity to cure. While Forrest Construction seems to argue that the duty to give notice and an opportunity to cure is an unyielding requirement, the aforementioned cases indicate that the surrounding circumstances must be taken into account to determine what was reasonable under the circumstances. The Laughlins sought damages only for the defects that they discovered *after* moving into the residence in January of 2005. By this time, Forrest Construction had materially breached the contract by abandoning the job site, and did not return the phone call of Mr. Laughlin regarding this abandonment. Therefore, we affirm the trial court's ruling that the Laughlins were

excused from the requirement to give notice and an opportunity to cure the alleged defects.

*Forrest Const. Co., LLC v. Laughlin*, 337 S.W.3d 211, 231 (Tenn. Ct. App. 2009) (emphasis in original, footnote omitted).

We see no necessary contradiction between *Manor Homes* and *Forrest Const. Co., LLC*. Tennessee caselaw requires notice and an opportunity to cure construction defects. This requirement is not absolute, however. If, for instance, a contractor simply walks off a job, or is *entirely* incompetent, the requirement may be excused. In those circumstances, the builder has not merely been deficient in one detail or another on a project, but has demonstrated an unwillingness or complete inability to do the job. In that case, an opportunity to cure would be futile. That is distinct from scenarios involving defects that are amenable to cure. As reflected by paragraph 10 of the Contract, a construction project is almost certain to feature some imperfections along the way, and a builder almost always will be in a position to have superior knowledge about them. To excuse the requirement to give notice and a reasonable opportunity to cure any defects discovered because the builder had superior knowledge about them would effectively nullify the requirement. Here, it would be contrary to the language of paragraph 10 of the Contract, as well.

Our inquiry, then, centers on whether the defects alleged in the present case are of the sort that are amenable to cure. The MaGees contend that there are material facts in dispute regarding the severity of the defects and whether Mr. MaGee's initial refusal to allow GCB back was reasonable. Specifically, the MaGees point to Charles Alexander's affidavit detailing numerous defects in the home's construction. At this, the summary judgment stage, we must discern whether there is a dispute of material fact necessitating determination by the trier-of-fact. The crux of the Alexander affidavit is that GCB did a badly rushed job. Taking that assessment as completely true, this was not enough to excuse Mr. MaGee from giving GCB notice and a reasonable opportunity to cure as he originally agreed to do before changing his mind.

Nevertheless, the MaGees assert that Paragraph 19 of the Contract, set forth in the Background section of this Opinion, provides a right to terminate. Indeed, the Owner may terminate in instances where the Contractor "materially defaults or materially neglects to carry out the work in accordance with the contract documents." However, another provision of the Contract, Paragraph 10, provides for an opportunity to cure defects. These provisions are not at odds. Paragraph 19 obviates neither Tennessee caselaw on the opportunity to cure nor the terms of Paragraph 10 of the Contract. Paragraph 10 states, in part, that "[u]pon receipt of Owner's written report of a defect, if the defective item is covered by the Contractor's duty and quality workmanship,

-14-

Contractor shall repair or replace it at no charge to Owner within thirty (3) days." We note the discrepancy in the Contract as to the amount of time the Contractor has to makes repairs or replacements. However, we need not decide whether the Contract provided for three days or thirty days because Mr. MaGee went back on his initial assent and told GCB unequivocally that it could not return to cure the defects. The MaGees did not budge for three months until their counsel sent GCB a letter stating it could return, which leads us to consider whether this late change of mind constituted a reasonable opportunity to cure.

The MaGees assert that their allowing GCB back—albeit after three months had passed—reflects that GCB was, in fact, given a reasonable opportunity to cure. According to the MaGees, "the trial court appears to have taken no account of the undisputed fact that Mr. MaGee made the effort to have GCB cure its construction defects in November 2015," and "[t]he trial court's failure to give credit to the opportunity to cure provided by Mr. MaGee warrants reversal of the summary judgment granted in favor of GCB. . . ." What the MaGees overlook is that Mr. MaGee told GCB, unequivocally, that it could not return to the jobsite. Mr. MaGee later confirmed this. Mr. MaGee's tardy reversal after three months passed was in no sense a reasonable opportunity to cure for GCB. We find, as did the Trial Court, that Mr. MaGee committed a material breach of the Contract.

We next address whether the Trial Court erred in declining to find that Mr. MaGee is entitled to an accounting of funds paid to GCB. The MaGees contend that there was no formal settlement of the non-flooring issues, and that they retained their rights under the Contract. According to the MaGees, the Trial Court found an accord and satisfaction that does not exist. However, the record is clear that the parties settled their non-flooring issues. All that remained was the $25,418.51 in dispute related to the flooring. In view of the partial settlement, we agree with the Trial Court that an accounting of all funds paid is neither appropriate nor necessary. We affirm the Trial Court in its dismissal of Mr. MaGee's request for an accounting.

The final issue we address is whether GCB is entitled, under the Contract, to an award of attorney's fees incurred since the Trial Court entered its January 2019 order on attorney's fees. To recap, the Trial Court already has awarded GCB $62,844.96 in attorney's fees incurred in a lawsuit over approximately $25,000, notwithstanding Mr. MaGee's counterclaim. Moreover, it does not appear that all of the awarded attorney's fees were related to the flooring issue. Under these circumstances, GCB is entitled to no additional attorney's fees under the Contract. GCB already has received a reasonable fee. We affirm the judgment of the Trial Court in all respects.

## Conclusion

-15-

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Neill MaGee, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE